BAKER, BOURGEOIS & ASSOCIATES, INC., *et al.*, Plaintiffs-Appellants, *v.* SIDNEY TAYLOR *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 79-957

Opinion filed May 27, 1980.

Gilbert Feldman, of Cornfield and Feldman, of Chicago, for appellants.

Darryl M. Fohrman and Joel M. Hurwitz, both of Fohrman, Lurie, Sklar & Cottle, Ltd., of Chicago, for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This is an appeal from summary judgment in favor of defendants in plaintiffs' action alleging a conspiracy to defraud and to deprive plaintiffs

of the benefits of a management agreement. Plaintiffs are Baker, Bourgeois & Associates, Inc. (BB&A), and BB&A's sole owners, Jerome Baker and Lee Bourgeois. Defendants are Main Corporation (Main Corp.), a bank holding company; Main Bank of Chicago (Main Bank or the Bank); Main Automated Services, Inc. (MAS), also a subsidiary of Main Corp. and the subject of the management agreement in dispute; Sidney Taylor, chairman of the board of Main Corp., Main Bank, and MAS, and a principal shareholder of Main Corp.; and Irwin Cole, treasurer of MAS and the other principal shareholder of Main Corp.

 · The pleadings establish that in March of 1971, pursuant to discussions between Sidney Taylor and Jerome Baker, MAS was formed for the principal purpose of operating a computer service bureau for Main Bank and its customers. Taylor became MAS' chairman and Baker became its president and chief operating officer. Half of the equity in MAS was owned by Main Corp. and half by Baker and Bourgeois, but Main Corp. retained an 80% majority voting power. Baker and Bourgeois were to provide the expertise to operate MAS, which they decided to do through their own corporation, BB&A. BB&A and MAS then entered into an agreement under which BB&A agreed to manage MAS for a period of 10 years at $42,000 per year.

The parties embarked on the operation of MAS as a computer services bureau, at first buying time on computers owned by others. Then, in July of 1973, a computer was purchased for the use of MAS. Main Bank provided the necessary funds in the form of a loan to Baker and Bourgeois. Baker and Bourgeois executed a promissory note to Main Bank, used the proceeds of the loan to buy the computer, and immediately leased the computer to MAS. Baker and Bourgeois also executed a security agreement with Main Bank, in which they pledged their interests in the computer and in the lease agreement with MAS as collateral for the loan from the Bank. It is not disputed that the transaction took this form because of the resulting tax advantages that inured to Baker and Bourgeois' benefit.

In November of 1973, Taylor, on behalf of MAS, advised BB&A that the management agreement was being terminated. Plaintiffs brought the instant action in early 1974. Count I of their second amended complaint attempted to state a cause of action in tort against all defendants for conspiring to defraud plaintiffs and to deprive them of the benefits of their management agreement. Count II alleged wrongful repudiation on the part of defendant MAS and sought damages for breach of contract, while count III sought judgment, again only against MAS, on an unrelated note from MAS to BB&A. Defendants answered, denying any fraudulent representation, conspiracy, or breach and contending in an affirmative defense and counterclaim that MAS justifiably terminated the

management agreement because of plaintiffs' failure to perform properly.

Subsequently, although Baker and Bourgeois were no longer participating in MAS and discovery was proceeding in their 1974 lawsuit, MAS continued to use the computer it had leased from Baker and Bourgeois and to make monthly payments on the lease. Baker and Bourgeois, in turn, continued to make the monthly installment payments due on their loan from Main Bank. In November of 1977, all payments stopped. Main Bank, in early 1978, brought an action on the note against Baker and Bourgeois, which action is the subject of Baker and Bourgeois' appeal in No. 79-854, a related appeal being considered with this case. Baker and Bourgeois filed a counterclaim in that action for the payments due on the lease; simultaneously, they added the same contentions as count IV of their complaint in the case at bar. Count IV alleged that defendants acted and represented themselves as a single entity throughout their dealings with plaintiffs. These dealings, it was essentially alleged, constituted a unitary transaction under which Baker and Bourgeois' rights to manage MAS and to receive payments from MAS on the computer lease were conditions precedent to Baker and Bourgeois' obligation to pay on the note to Main Bank. Plaintiffs further alleged, but defendants denied, that defendants had managed MAS into insolvency. Defendants denied acting as a single entity, contended that only MAS was obliged on the lease, and stated that under the terms of Main Bank's security agreement with Baker and Bourgeois, the Bank now possessed the sole right to receive payments under the lease.

All defendants filed motions for summary judgment. Plaintiffs responded by submitting an affidavit by plaintiff Baker. The trial court granted summary judgment for defendants on count I and denied plaintiffs' motion for leave to amend count I specifically to allege tortious interference with contract. The court granted the motions of all parties for voluntary nonsuits on counts II and III, and also dismissed Baker and Bourgeois as parties in MAS' counterclaim for breach of contract. Finally, the court struck count IV in order to proceed to trial on the nearly identical counterclaim in the 1978 action on the note by Main Bank. Plaintiffs have appealed from all portions of the order except that relating to the voluntary nonsuits of counts II and III.[1]

The primary issue on this appeal is whether Baker's affidavit created

[1] Some confusion surrounds the dismissal of Baker and Bourgeois as parties in MAS' counterclaim for breach of contract. On appeal, plaintiffs point out the absence of any motion requesting such action, and they appeal therefrom; defendants refer to the counterclaim as having been voluntarily dismissed, and they do not appeal. Possibly what the court had in mind was that only BB&A, and not Baker and Bourgeois as individuals, were parties to the management agreement. But in view of defendants' position, we will regard the counterclaim as voluntarily dismissed.

a genuine issue of material fact sufficient to preclude summary judgment on count I, which charged defendants with conspiring to defraud and deprive plaintiffs of the benefits of the management agreement. However, Baker's affidavit was submitted in support of both count I and count IV, and therefore much of it is addressed to count IV's contentions regarding the computer purchase and lease. Count IV is only peripherally involved here, as it was struck by the trial court and its contentions sent to trial in the form of a counterclaim in the related action on the note by Main Bank. At that trial, moreover, Baker offered testimony quite similar to his affidavit in this action. Nevertheless, we will fully set out Baker's affidavit here for whatever factual issues it may tend to raise on count I. In our consideration of the related appeal in No. 79-854, we will refer to this summation of the evidence, indicating how, if at all, Baker's trial testimony departed from his affidavit.

Baker's affidavit stated that Taylor told Baker that he was president of Main Bank and that he and Cole principally owned and controlled the Bank. Taylor asked Baker to set up and operate a computer service bureau for the Bank so that the Bank could compete with other banks. Baker and Taylor discussed the matter and reached an agreement in which Bourgeois and Cole later joined. Taylor initially wanted Baker to become an employee of Main Bank, but Baker responded that he and Bourgeois preferred an equity interest. Taylor agreed and stated that he would accomplish this by setting up a new corporation, MAS, in which 50% of the stock would be owned by Baker and Bourgeois and 50% by the Bank holding company, Main Corp. This would permit Main Corp. to write off the anticipated initial losses of MAS against Main Bank's profits. At Taylor's request, Baker made projections which showed that MAS would operate at a loss during the initial three-month set-up period and the subsequent three-year developmental period, after which profits were anticipated. Taylor agreed the Bank would provide the cash to start the project, as well as additional funds to cover operating losses during the developmental period. Baker and Taylor continued discussions, Baker averred, under the premise that the Bank would provide the capital and Baker and Bourgeois would furnish the services.

Baker and Taylor agreed that MAS would begin operating by buying computer time, until the volume of business warranted the puchase of an in-house computer to be set up on the second floor of the Main Bank building. Taylor insisted that Baker and Bourgeois, through BB&A, sign a 10-year, noncancellable management agreement so they would not leave him with a computer services bureau he could not operate. Baker and Bourgeois agreed, and MAS began operating under BB&A's management, on capital provided by the Bank.

MAS soon ran out of operating capital. After one additional loan from Main Bank, Taylor instructed Baker to use for financing the "float"

created by customer deposits made to cover payrolls processed by MAS. Also at this time, Baker began to deal with Cushman Gray, a vice president of Main Bank who held no position in MAS, as an intermediary between Baker and Taylor.

In April of 1973, Taylor agreed to Baker's recommendation that MAS purchase its own computer. At first, Taylor suggested that the tax advantages related to the purchase of computer equipment could inure to the benefit of Taylor, Cole, Bourgeois, and Baker if they took title to the equipment and leased it to MAS. Taylor then stated that he and Cole preferred not to own the equipment and suggested that Bourgeois and Baker take the entire tax advantage, to which they agreed. Taylor proposed to structure the transaction as follows: Main Bank would pay for a computer through a loan to Baker and Bourgeois, who would take title to the computer; they would lease the computer to MAS under a lease agreement which provided them the funds with which to repay the loan from the Bank; and MAS would have an option to buy the computer upon making the last lease payment to be used to repay the loan. Baker averred that Taylor did not state that Baker and Bourgeois would have any interest in the computer other than to act as a conduit for the payments from MAS to Main Bank and to reap the tax benefits until MAS acquired title to the computer.

Baker further averred that "[t]his agreement was implemented" on August 1, 1973, when Taylor produced the necessary legal documents and they were signed by the respective parties. Neither Taylor nor Cole intimated any intention of terminating the existing management agreement, or Baker would not have entered into the transaction.

MAS began operating with the computer in space leased above Main Bank. According to Baker, MAS showed its first monthly profit in October 1973, at which time he considered MAS' developmental period to have ended. In mid-November 1973, Taylor and Cole began to complain to Baker about the operating capital required by MAS and the need to repay the money borrowed from the payroll float. Taylor then said that Bourgeois and Baker would be required to contribute $50,000. Baker and Bourgeois protested that this was not in accord with their original agreement that Main bank would provide the money and they the expertise. Baker's affidavit stated that Taylor told them to come up with the money or they would be ousted from MAS. When plaintiffs declared their inability, Taylor directed Baker to turn all MAS records over to Gray, the Main Bank vice president. Taylor subsequently terminated the management agreement in a letter signed as chairman of MAS but on Main Bank stationery. Baker did turn over the MAS records to Gray.

From that time on, Baker had no participation in MAS' affairs. MAS continued to use the computer and to make monthly payments on the computer lease, and Baker and Bourgeois correspondingly continued to

pay on the note to the Bank. In late 1977, Taylor and Cole stated their intent to terminate MAS' operations. Taylor sold MAS' accounts, and in November 1977, MAS stopped paying on the lease. In turn, Baker and Bourgeois stopped paying on the loan from Main Bank. In early 1978, defendants sold the computer, which the Bank had apparently seized under the security agreement executed in connection with the loan to plaintiffs.

Plaintiffs first contend that summary judgment on count I was improper because Baker's affidavit raised an issue of fact whether defendants conspired to deprive plaintiffs of the benefits of their management agreement. Plaintiffs' theory is that from the beginning defendants had no intention of retaining Baker and Bourgeois for the 10-year term of the agreement. Instead, pursuant to a conspiracy, they induced Baker and Bourgeois to enter the agreement and perform thereunder only through the developmental period and until MAS became profitable. At the point defendants no longer needed Baker and Bourgeois and they could and did seize upon a pretext to oust BB&A from MAS, thereby depriving plaintiffs of the benefits of their agreement.

■■ ■ We note plaintiffs' complaint pleaded that defendants accomplished all this fraudulently. As defendants point out, there is a complete failure of proof that any of the defendants made any misrepresentation of fact. At best, Baker's affidavit arguably established the possibility that defendants did not intend to go through with the management agreement for the full 10 years. It remains the law in Illinois that a promise to perform an act, even though made without a present intention to perform, is insufficient to constitute fraud. (*Roda v. Berko* (1948), 401 Ill. 335, 340, 81 N.E.2d 912; *Zaborowski v. Hoffman Rosner Corp.* (1976), 43 Ill. App. 3d 21, 23, 356 N.E.2d 653.) These cases do recognize an exception " '* * * where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud * * *.' " But as the court in *Zaborowski* went on to point out, it is not enough that the party has made a false promise not intending to keep it; the total facts must show a scheme or device to defraud, and the fraud must be pleaded with specificity. (43 Ill. App. 3d 21, 25.) Plaintiffs have not so specifically pleaded, nor is there anything in Baker's affidavit that would raise an issue of fact as to the existence of such a scheme. If anything, Taylor's insistence on a 10-year agreement militates against and not in favor of plaintiffs' position. Baker's affidavit certainly raises an issue of fact as to whether MAS wrongfully terminated the agreement, but that is the subject of plaintiffs' count II, which was voluntarily dismissed, not count I, which we are discussing here.

Perhaps conceding the weakness of their position on this point, plaintiffs contend that they have not and need not have argued fraud.

Instead, they assert that alleging a "conspiracy to deprive plaintiffs of the benefits of their agreement" is sufficient to state a cause of action in tort. However, under the circumstances this would merely translate into a conspiracy to breach a contract. Plaintiffs have cited no authority that gives such allegation any more force than a simple allegation of breach of contract. A similar "conspiracy" could be alleged in every case in which parties jointly obligated under a contract elected not to perform. Once again, the record may well establish an issue of fact whether the contract was breached, but that is not the question raised by plaintiffs' count I.

■■ Plaintiffs also argue that an issue of fact exists as to whether defendants were guilty of tortious interference with contract by inducing MAS to reach the management agreement. Plaintiffs' position that their complaint already alleges such a tort would seem belied by their endeavor to amend their complaint to so provide, and we believe it was within the trial court's discretion to deny plaintiffs' last-minute attempt to amend a thrice-amended complaint. Moreover, in *Swager v. Couri* (1979), 77 Ill. 2d 173, 187-93, 395 N.E.2d 921, our supreme court recently indicated its disfavor with attempts to impose such tort liability in the context of the privilege of corporate officers, directors, and shareholders to influence the actions of their corporation. (77 Ill. 2d 173, 191.) The court made clear that "corporate officers who, 'in accordance with their business judgment and discretion,' interfere with their corporation's contractual relations lack the requisite 'malice' and therefore are not liable in tort." (77 Ill. 2d 173, 189, quoting *Loewenthal Securities Co. v. White Paving Co.* (1932), 351 Ill. 285, 300, 184 N.E.2d 310.) Accordingly, the trial court properly entered summary judgment in favor of defendants on count I of plaintiffs' complaint.

Count IV of plaintiffs' complaint, as we have stated, is only peripherally involved on this appeal. The only issue here is whether the court properly struck count IV so as to proceed to trial on a counterclaim, making identical allegations, in Main Bank's suit on the promissory note. Section 51 of the Civil Practice Act vests discretion in the trial court to consolidate or sever actions when convenient and when it can be done without prejudice to a substantial right. (Ill. Rev. Stat. 1977, ch. 110, par. 51.) Plaintiffs argue they were prejudiced because there were issues of fact as to count IV, but the court's action in striking the count and proceeding to trial on identical allegations would seem to amount to a denial, not a grant, of summary judgment. The only possible prejudice lies on the fact that count IV in this action alleged liability against all five defendants, while the counterclaim on which trial proceeded was brought only against the Main Bank. (However, the caption used by the court in its ultimate order and by the parties thereafter shows MAS as an additional counterdefendant and BB&A as an additional counterplaintiff.)

Although the disparity in defendants was noted by all concerned in the court below, plaintiffs did not suggest the other defendants to be added, which we believe would have been the proper course. Since the theory of count IV was that defendants acted as a single entity and the proof would have been the same in any event, we do not believe plaintiffs suffered any prejudice in that regard. But because the court's ultimate disposition of the issues raised in count IV and merged with the counterclaim is being reversed in the related appeal, No. 79-854, the trial court's order in this cause should be modified to provide that all defendants remain parties upon retrial of the issues raised here but tried as the counterclaim.

For the foregoing reasons, the judgment order appealed from is affirmed, except that the court's order striking count IV and merging it with the counterclaim in the other action is reversed and remanded with directions to include all defendants on retrial.

Affirmed in part; reversed in part; remanded with directions.

DOWNING and HARTMAN, JJ., concur.