MAIN BANK OF CHICAGO, Plaintiff and Counterdefendant-Appellee, *v.* JEROME BAKER, Defendant and Counterplaintiff-Appellant.—(LEE BOURGEOIS, Defendant and Counterplaintiff; MAIN AUTOMATED SERVICE, INC., Counterdefendant-Appellee; BAKER, BOURGEOIS & ASSOCIATES, INC., Counterplaintiff-Appellant.)

First District (2nd Division)    No. 79-854

Opinion filed May 27, 1980.—Modified on denial of rehearing September 23, 1980.

Gilbert Feldman, of Cornfield and Feldman, of Chicago, for appellants.

Darryl M. Fohrman and Joel M. Hurwitz, both of Fohrman, Lurie, Sklar & Cottle, Ltd., of Chicago, for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This is an action on a note brought by Main Bank (Bank) against Jerome Baker and Lee Bourgeois. Baker and Bourgeois, joined Baker, Bourgeois & Associates, Inc. (BB&A), filed a counterclaim against Main Bank in which Main Automated Services, Inc. (MAS) was joined as an

additional counterdefendant. After a jury heard the evidence offered by both sides, the trial court directed verdicts for Main Bank and MAS. The court further awarded the Bank attorney's fees of $18,000. Baker and BB&A have appealed,[1] contending that the cause should have been submitted to a jury and that the award of attorney's fees had an improper basis.

The parties are identified and the factual background to this case is set out in our opinion in a related appeal, No. 79-957, involving these parties. (*Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909, 410 N.E.2d 55.) Only such facts as are necessary to understand the issues raised in the appeal at bar are repeated or added here.

Main Bank brought this suit against Baker and Bourgeois, seeking recovery upon a note. Baker and Bourgeois answered, admitting default on the note but alleging their promise to pay was conditional and therefore denying any money was due on the note. In an affirmative defense, they contended that they, in conjunction with Main Bank, had agreed to purchase a computer for MAS, which Baker and Bourgeois were managing through BB&A. Pursuant to this asserted agreement the Bank provided the cash ($283,077) to purchase the computer; Baker and Bourgeois took title to the computer and executed a note (in the sum of $382,180) to the Bank; they then leased the computer to MAS under an agreement providing for rental payments similar in amount to their installment payments under the note. Thus, the lease obligated MAS to make 78 monthly payments of $4692.62 to Baker and Bourgeois, and gave MAS an option to buy the equipment for $28,000 at the expiration of the lease. In turn, the note executed by Baker and Bourgeois obligated them to make 78 monthly payments of $4549.76 to the Bank, with a final balloon payment of $27,289.72. The security for the note consisted of the computer and the lease agreement.

Baker and Bourgeois made all payments due on the note from July 1973 to November 1977 and during this period received the designated payments on the lease. Baker and Bourgeois alleged that the Bank, acting as a single entity with MAS, terminated BB&A's agreement to manage MAS in November 1973, and then, four years later, in November 1977, stopped payments under the lease. Baker and Bourgeois contended that under their agreement with Main Bank their rights to manage MAS and to receive the payments on the lease were conditions precedent to their promise to pay on the note, and that by violating this claimed understanding, the Bank extinguished its right to payment on the note.

In their counterclaim Baker and Bourgeois alleged that Main Corporation, the Bank holding company; Main Bank; Sidney Taylor,

---

[1] The record reveals that a citation to discover Bourgeois' assets was dismissed without prejudice on the Bank's representation that Bourgeois had filed a petition in bankruptcy.

chairman of Main Corporation, Main Bank, and MAS, and a principal shareholder of Main Corporation, and Irwin Cole, also an officer of MAS and a principal shareholder of Main Corporation, all acted as a single entity with respect to Baker and Bourgeois. Baker and Bourgeois alleged that the management agreement, note, and lease were all one transaction between them and the single entity. Their counterclaim demanded payments due on the lease.

The Bank answered, denying the single entity theory, denying it was party to any agreement but the note and security agreement executed with the note, denying it owned any stock in or participated in the affairs of MAS, and denying payment under the note was in any way connected with payment under the lease. When Baker and Bourgeois entered into the security agreement accompanying the note, they pledged not only the computer but the lease agreement as collateral. Therefore, although Main Bank admitted MAS had failed to make payments due on the lease, under the security agreement, the Bank now asserted the sole right to receive payments under the lease because of Baker and Bourgeois' default on the note. Baker and Bourgeois denied their pledge of the lease agreement was unconditional.

A jury trial ensued. The Bank introduced the note and security agreement through its president, who also established that the computer had been sold, reducing the amount due on the loan to $81,122.36. He testified that Sidney Taylor, the Bank's chairman, preceded him as president and chief operating officer of the Bank and held those positions in 1973. The only other testimony offered by the Bank was a stipulation by Bourgeois, who has not joined in this appeal.[2] Bourgeois admitted the validity of the note and security agreement as well as the lease. He did not recall any conversation with Taylor, Cole, or any Main Corporation official regarding the purchase of a computer. He admitted defaulting on the note; he also detailed the tax deductions he and Baker received owing to the computer purchase. The Bank rested its case.

Baker offered only his own testimony. The Bank objected to Baker's recounting of any conversations with Taylor on the ground of immateriality, but the court overruled the objection. Baker's testimony was essentially the same as that given in his affidavit set out in our related opinion in appeal No. 79-957. (*Baker, Bourgeois & Associates, Inc.*) The formation of MAS to provide computer services for the Bank and its customers was detailed. The management agreement between BB&A and MAS and the lease agreement were admitted into evidence. Baker also stated that the loan and lease agreements and the conversations leading up thereto all took place in Taylor's office as chief executive of the Bank.

---

[2] See note 1.

In addition Baker testified that both agreements were primarily prepared by the Bank. Also introduced was the letter from Taylor, signed as chairman of MAS but on his Main Bank stationery, removing Baker and Bourgeois as managers of MAS.

On cross-examination, Baker admitted defaulting on the note. It was also established that the managment agreement contained an integration clause providing that it "incorporated all of the understandings and undertakings by the parties." The lease similarly provided: "This instrument constitutes the entire agreement between the parties." No such clause was pointed out in the note or security agreement, and it was established that neither expressly referred to the lease agreement as a condition precedent. Baker also admitted making payments on the note for four years after termination of the management agreement.

The court granted a directed verdict for the Bank on the note, stating that it found no evidence of any agreement other than the written contracts in evidence, that the parties operated at arm's length, and that there was no concealment by use of different corporate names. The court also directed a verdict for the Bank and MAS on the counterclaim, stating that it had some difficulty in ruling in favor of MAS, but no evidence had been offered to show there was any money due Baker and Bourgeois at the present time. The court subsequently awarded attorneys' fees to the Bank pursuant to a provision in the note for reasonable attorneys' fees.

The primary issue is whether Baker presented enough evidence to warrant submission to the jury of his theory that his obligation on the note was linked to his rights under the management and lease agreements, or whether all the evidence, viewed most favorably to Baker, so overwhelmingly favored the Bank that no contrary verdict could ever stand. Defendant contends that the note, lease agreement, and management arrangement should be construed as one transaction with a single entity— the Bank. He further maintains that once sufficient evidence was introduced to support these implications, section 3—119 of the Uniform Commercial Code mandates that the various agreements be construed as one course of dealing. Section 3—119 provides:

"(1) As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument.

(2) A separate agreement does not affect the negotiability of an instrument." Ill. Rev. Stat. 1977, ch. 26, par. 3—119.

Plaintiff Main Bank however responds that defendant has misread the import of section 3—119. It asserts that this section was not intended to create a presumptive contingency between documents which were executed as part of the same transaction. Rather, section 3—119 is an explication of the circumstances under which one writing can be used to modify or affect another writing executed contemporaneously.

The Uniform Commercial Code, as codified in chapter 26 of the Illinois Revised Statutes (Ill. Rev. Stat. 1977, ch. 26, par. 3—101 *et seq.*), contains several sections which speak to the interpretation of terms contained in commercial paper. While section 2—202 contains the codification of the parol evidence rule for sales contracts, the commercial paper section (Ill. Rev. Stat. 1977, ch. 26, pars. 3—101 through 3—805) does not explicitly address the parol evidence rule. Rather, sections 3—118 and 3—119 recite rules of construction where the writing contains an ambiguity or where more than one writing was executed as part of one transaction. Section 3—118 provides:

"The following rules apply to every instrument:

(a) Where there is doubt whether the instrument is a draft or a note the holder may treat it as either. A draft drawn on the drawer is effective as a note.

(b) Handwritten terms control typewritten and printed terms, and typewritten control printed.

(c) Words control figures except that if the words are ambiguous figures control.

(d) Unless otherwise specified a provision for interest means interest at the judgment rate at the place of payment from the date of the instrument, or if it is undated from the date of issue.

(e) Unless the instrument otherwise specifies two or more persons who sign as maker, acceptor or drawer or indorser and as a part of the same transaction are jointly and severally liable even though the instrument contains such words as 'I promise to pay.'

(f) Unless otherwise specified consent to extension authorizes a single extension for not longer than the original period. A consent to extension, expressed in the instrument, is binding on secondary parties and accommodation makers. A holder may not exercise his option to extend an instrument over the objection of a maker or acceptor or other party who in accordance with Section 3—604

tenders full payment when the instrument is due." (Ill. Rev. Stat. 1977, ch. 26, par. 3—118.)

The Uniform Commercial Code Comments to section 3—118 state that the purpose of these rules of construction is to:

> "protect holders and to encourage the free circulation of negotiable paper by stating rules of law which will preclude a resort to parol evidence for any purpose except reformation of the instrument." (Ill. Ann. Stat., ch. 26, par. 3—118, Uniform Commercial Code Comment 1 (Smith-Hurd 1963).)

Section 3—119 supplements the rules of construction in section 3—118 by allowing contemporaneous writings to be construed together. It specifically does not provide for evidence of a parol nature. (Ill. Ann. Stat., ch. 26, 3—119, Uniform Commercial Code Comment 1, and Illinois Code Comment (Smith-Hurd 1963) ("evidence of oral agreements made at the same time the instrument is executed has not been admissible to vary its terms even as between the original parties").) Accordingly, the fact that the note in the instant case is a negotiable instrument does not preclude proof of the existence of other related, modifying instruments. The effect of the modification may well be to define the obligations of the parties as the total obligation resulting from reading together all writings, rather than the separable, individual obligations arising from each writing. (P. Anderson, 2 Uniform Commercial Code §3—119:4 (2d Ed. 1971).) Nevertheless, inherent in the application of 3—119 is the idea that the writings, when read together, may provide for additional obligations. Although the writings were executed at approximately the same time, each may have been intended as a separate agreement, to provide for severable understandings. Anderson, in his treatise on commercial paper, states the test of separability as:

> "[I]f a note or mortgage are on separate sheets, or if there are indications in them that they were intended to be separable, and there is no reference by one to the other, each is separate from the other." (Anderson, §3—119:3.)

Thus, even though section 3—119 *allows* writings executed as a part of one transaction to be read together, there is "still room for construction of the writing as not intended to affect the instrument at all." (Ill. Ann. Stat., ch. 26, par. 3—119, Uniform Commercial Code Comment 3 (Smith-Hurd 1963).) Therefore, the question is whether there is an ambiguity, express condition, or internal conflict in the writings from which would arise a need for parol or extrinsic evidence.

As we have previously stated, evidence of oral agreements made at the time the instrument is executed is generally not admissible to vary the terms of the writing absent conditional delivery, ambiguity in the note, or

a defense of fraud. (See Ill. Ann. Stat., ch. 26, par. 3—119, Illinois Code Comment and cases cited therein (Smith-Hurd 1963); see also *Continental Bankers Life Insurance Co. v. Bank of Alamo* (Tenn. 1979), 578 S.W.2d 625, 630 (explaining a statute parallel to Illinois' section 3—119 and excluding parol evidence of additional terms which would vary note in question).) This rule of exclusion results from a policy of promoting certainty and security in commercial transactions.

■■ In the case at bar, defendant does not suggest that there is an ambiguity or express condition in the writing which might provide for the introduction of parol evidence to explain its terms. To the extent that his testimony attempted to establish an oral agreement to make his payment on the note contingent upon MAS's obligations on the lease, it was inadmissible.

■■ There remains the issue of whether the writings themselves manifest a contingency agreement that defendant would only pay on the note for so long as MAS paid on the lease and continued its management agreement with Baker and Bourgeois. Although the management agreement may have been in the minds of the parties at the time of the making of the note and the lease, it was executed more than two years prior. We are cognizant of those cases which state that the writings need not have been executed at precisely the same time to be part of the same transaction (see, *e.g., Elsberry Equipment Co. v. Short* (1965), 63 Ill. App. 2d 336, 346, 211 N.E.2d 463 (allowing 41 days difference)); nevertheless, the two-year lapse is clearly unanticipated by section 3—119. If the writings were intended as a part of one transaction, each would necessarily be made in anticipation of the other. In the instant case, there is a dearth of factual support for the premise that the management agreement was made in anticipation of the note and lease. The management agreement falls within the common sanction against the introduction of prior written agreements to modify later writings. If we are to find payments on the note dependent upon compliance with the lease, then such a condition must arise out of the lease and the note since those are the only writings presented by the parties which were part of the same transaction. Defendant appears to find his evidence of a contingency in the penumbra of the two writings. Absent admissible oral evidence, he now contends that the contingency is an implied condition precedent arising from the execution of the two documents as one transaction.

In *Sturgis National Bank v. Harris Trust & Savings Bank* (1933), 351 Ill. 465, 184 N.E. 589, our supreme court cited a Wisconsin case, *Thorpe v. Mindeman* (1904), 123 Wisc. 149, 101 N.W. 417, and stated that it contained "an excellent discussion of this same question, to what extent, if at all, the general rule that agreements contemporaneously executed, pertaining to the same subject matter, are to be construed together,

imports into a promissory note the collateral agreements contained in the accompanying mortgage." (*Sturgis National Bank*, at 477.) *Thorpe*, in discussing the negotiability of a note executed at the same time as a mortgage, explained:

> "The appellants' contention really results from a confusion of ideas. They lay down the well-understood proposition that *contemporaneous instruments relating to the same subject matter are to be construed together*, and conclude that it follows that a note and mortgage, though separately executed, are one instrument, and that the note is that instrument. The rule that instruments are to be construed together does not lead to this result. Construing together simply means that, if there be any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect * * *."
> (*Thorpe*, at 154.)

In the case at bar the note and lease are not so closely related as the note and mortgage-back for security discussed in *Sturgis*. Issues of relationship (whether the Bank and MAS were a single entity and whether the documents were executed as part of one transaction) are generally questions of fact for the jury. The key issues of whether the note contained provisions from which a condition could be inferred or whether the lease modified the facially unconditional note were properly within the province of the trial court. See Anderson, 2 Uniform Commercial Code §3—118:3 (2d 1971); J. Calamari & J. Penillo, Contracts §40, at 76 (1970).

Although most of the case law, including *Sturgis*, concerns itself with negotiability, and in the instant case the issue instead is collectibility, the same legal test applies for determining whether a note or draft is conditional. (*Bank of Viola v. Nestrick* (1979), 72 Ill. App. 3d 276, 277, 390 N.E.2d 636.) In *Bank of Viola*, it was held that to find payment on a note conditioned on the existence of a separate fund from which the note payments would be made, words of explicit limitation are required. (*Bank of Viola*, at 279 (construing section 3—105 (Ill. Rev. Stat. 1973, ch. 26, par. 3—105) of the Uniform Commercial Code).) As in *Bank of Viola*, the note at issue here contains no words of explicit limitation of payments on the note to funds received from the lease agreement. Applying the familiar postulates that the law favors negotiable and unconditional construction of notes, absent ambiguity, fraud, or express reference, we conclude that an implied condition precedent cannot arise from the mere fact of proximity in time and substantial identity of parties. Accordingly, the decision of the trial court to grant a directed verdict was proper.

■■ The trial court's award of attorneys' fees, however, must be reversed

and remanded. The Bank is only entitled to reasonable attorneys' fees expended in recovering on the note itself, not in pursuing the entire litigation.

On May 27, 1980, this court filed an opinion in a related case, *Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909, 410 N.E.2d 55. We reversed and remanded the final issue in that case, which was virtually identical to the principal issue in this case, to the trial court for reconsideration. Our remand in *Baker* was predicated on an initial opinion in the instant case, which opinion is hereby withdrawn after rehearing. We are cognizant that an inconsistency exists between the result in the instant case and our disposition in *Baker*. Plaintiff herein filed a motion for rehearing following our initial opinion in the instant case, but inexplicably failed to make such a motion following our disposition of *Baker*. Under these circumstances, this court has elected to abide this inconsistency, rather than endorsing a result not conforming to Illinois law.

For the foregoing reasons, the directed verdict of the trial court is affirmed and the question of attorneys' fees is reversed and remanded for further consideration.

Affirmed in part, reversed in part; remanded with directions.

DOWNING and HARTMAN, JJ., concur.