INTERNATIONAL MEAT COMPANY, INC., Plaintiff-Appellee, v. BILL BOCKOS *et al.*, Defendants-Appellants (Key West Restaurant & Lounge, Inc., Defendant).

First District (1st Division)   No. 86—0433

Opinion filed June 22, 1987.

Regas, Frezados & Harp, of Chicago (R. Kymn Harp, of counsel), for appellants.

R. S. Maione, of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendants, Bill and Harry Bockos, owners of Key West Restaurant & Lounge, Inc. (Key West), were found liable for damages for common law fraud against plaintiff, International Meat Company, Inc., and assessed actual damages in the amount of $42,331.95 and punitive damages in the amount of $43,000. Following the jury's verdict, plaintiff was granted leave to amend its complaint to include a claim for prejudgment interest, which the court awarded in the amount of $8,350. Judgment was then entered on the jury's verdict and the award of prejudgment interest. Thereafter, the trial court denied defendants' post-trial motion seeking the entry of a judgment notwithstanding the verdict (judgment *n.o.v.*) or, in the alternative, a new trial. On appeal, defendants contend that: (1) the jury's verdict finding them liable for common law fraud was contrary to the manifest weight of the evidence; (2) the trial court erred in refusing to admit into evidence several post-dated checks issued to plaintiff by defendants as payment for meat deliveries which had been honored and paid in September 1981; (3) the cumulative effect of the trial court's errors during the reopening of evidence severely prejudiced defendants; (4) the award of punitive damages was not warranted by the evidence and, in the alternative, was grossly excessive and unreasonable; (5) the award of compensatory damages was not warranted by the evidence and, in the alternative, was grossly excessive and unreasonable; (6) the trial court erred in giving prejudicial and erroneous jury instructions; and (7) the trial court erred in awarding prejudgment interest in favor of plaintiff. For the following reasons, we reverse the judgments of the trial court and remand the cause with

directions to enter a judgment *n.o.v.* with respect to the common law fraud count.

The record sets forth the following facts pertinent to this appeal. Plaintiff, a meat purveyor, had been supplying fresh meat to restaurants owned and operated by defendants for over 20 years. The most recent restaurant owned by defendants was the Key West, incorporated in 1979. Bill Bockos was president of the corporation, and Harry Bockos was the secretary-treasurer.

It is undisputed that defendants had a personal, as well as a business, relationship with Al LaValle, plaintiff's president, for over 25 years. Over the years, a business practice developed between the parties whereby defendants would pay for the meat deliveries to Key West with post-dated checks. If the post-dated checks were returned for insufficient funds, plaintiff would redeposit them. If the post-dated checks were returned a second time, plaintiff would notify defendants and they would issue a replacement check. As a result, defendants were regularly several months behind in their payments to plaintiff. However, because all invoices were eventually paid, plaintiff continued to deliver meat to Key West until mid-October 1981, at which time plaintiff decided that the arrearages were excessive. At the time of trial, plaintiff had been paid in full for all deliveries made up to June 1981. However, Key West owed plaintiff $42,331.95 for meat deliveries which had been made during the period from June 1981 through mid-October 1981.

In late August 1981, plaintiff received three checks from Key West; one was post-dated to October 26, 1981, and two were post-dated to October 30, 1981. These checks were allegedly in payment for deliveries made in June and July. Approximately 5 a.m. on Monday, October 26, 1981, Key West was destroyed by fire. At the time of the fire, receipts from the preceding weekend were in Key West's safe to be deposited the following Tuesday because the bank was closed on Mondays. As a result of the extensive fire damage to Key West, defendants did not gain access to the safe until Thursday, October 29, 1981. When plaintiff attempted to cash the three post-dated October checks, the checks were returned for insufficient funds. Defendants explained to plaintiff that the receipts from the weekend preceding the fire had had to be used to refund deposits which had been made by customers for upcoming holiday parties and weddings. However, defendants assured plaintiff that everyone would be paid. Despite the assurances, plaintiff received no further payments from defendants.

As a result of the nonpayment, on November 24, 1981, plaintiff

filed a one-count complaint against Bill and Harry Bockos, individually, alleging that they owed plaintiff $42,331.95 on account. Defendants moved to dismiss the complaint on the grounds that they had not entered into any transactions in a personal capacity with plaintiff. Instead, all transactions had been made by them on behalf of Key West. Plaintiff then amended its complaint to add Key West as a party defendant and to add several counts. The amended five-count complaint alleged the following: count I—personal liability of Bill and Harry Bockos for $42,331.95 on account; count II—liability of Key West for $42,331.95; count III—common law fraud against Bill and Harry Bockos, predicated on the three post-dated October checks which had been returned for insufficient funds; count IV—common law fraud against Key West[1]; and count V—fraudulent conspiracy of Bill and Harry Bockos and Key West to defraud plaintiff, predicated on an *alter ego* theory.

At trial, defendants admitted that Key West owed plaintiff for the deliveries made during the period from June 1981 through mid-October 1981, but denied personal liability for those debts and further denied that they had had any intent to defraud plaintiff. Following plaintiff's case in chief, the trial court granted defendants' motion for a directed verdict as to counts III (common law fraud) and V (*alter ego*), and denied a directed verdict as to count I (personal liability of defendants).

Defendants then proceeded with their defense as to count I, arguing that they had never conducted business with plaintiff in a personal capacity. Following the close of defendants' case, plaintiff moved for reconsideration and vacation of the order which had entered a directed verdict as to count III (common law fraud). The court granted the motion on the ground that the court had improperly intruded upon the function of the jury by determining that custom and usage between the parties negated the claim of fraud.

Following the court's decision to reinstate count III (common law fraud), defendants requested leave to reopen their case so as to present their defense as to fraud. The court limited testimony to matters regarding the fire on October 26, 1981, and prohibited any further testimony as to what the common practice had been between the parties. Thereafter, an October 11, 1985, following closing arguments, the jury rendered a verdict in favor of defendants and against plain-

---

[1]Pursuant to an order entered by the Federal bankruptcy court prior to trial, a stay was imposed on all proceedings against Key West. Therefore, plaintiff was precluded from pursuing counts II and IV at trial.

tiff as to count I (personal liability of defendants), and in favor of plaintiff and against defendants as to count III (common law fraud), and assessed actual and punitive damages against defendants predicated on count III.

On October 23, 1985, plaintiff requested leave to amend count III of its amended complaint to request statutory interest. Defendant objected on the grounds that the request was beyond anything the jury had considered and had not been sought in the pleadings. Plaintiff responded that the concept of "vexatious and unreasonable delay," the statutory grounds for an award of prejudgment interest, is implicit in an action for fraud. The trial court entered a judgment on the jury verdict and granted the request for prejudgment interest in the amount of $8,350, *nunc pro tunc* to October 11, 1985. Defendants' post-trial motion seeking entry of a judgment *n.o.v.* or, in the alternative, a new trial was subsequently denied and defendants' timely appeal followed. No cross-appeal was taken by plaintiff with respect to count I.

Defendants first contend that the trial court erred in denying their post-trial motion seeking judgment *n.o.v.* or, in the alternative, a new trial on the grounds that the jury's verdict as to count III for common law fraud was contrary to the law and against the manifest weight of the evidence. Defendants argue that their failure to have sufficient funds in the corporate account to cover the post-dated checks was nothing more than a broken promise and that the post-dated checks themselves acted as extensions of credit to defendants from plaintiff. Plaintiff responds that the practice of executing post-dated checks which defendants knew would never be honored was employed to induce plaintiff to continue delivering meat and constituted a scheme to defraud.

■■■ A motion for new trial will be granted if, after weighing the evidence, the trial court determines, in its discretion, that the verdict is against the manifest weight of the evidence, *i.e.*, an opposite conclusion is clearly evident or the jury's verdict is palpably erroneous. Upon review, the trial court's decision will not be disturbed unless it is clearly shown that an abuse of discretion has occurred. (*Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 49 N.E.2d 1236.) The evidentiary standard for entering a judgment *n.o.v.* is more stringent and requires that " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based upon that evidence could ever stand.' " *Parson v. Winter* (1986), 142 Ill. App. 3d 354, 360, 49 N.E.2d 1236, quoting *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229

N.E.2d 504.

In a cause of action for common law fraud, the plaintiff must prove that: (1) the defendant made a statement, (2) of a material nature, (3) which was untrue, and (4) which was known by defendant to be untrue, or was made in culpable ignorance of its truth or falsity; and (5) was made for the purpose of inducing reliance by plaintiff, (6) was actually relied upon by plaintiff, and (7) resulted in plaintiff's injury. The first four elements must be established by clear and convincing evidence. (*Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 49 N.E.2d 1236.) As a general rule in Illinois, a promise to perform a future act, even though made without a present intention to perform, is insufficient to constitute fraud. (*Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912; *Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909, 410 N.E.2d 55.) The exception to this general rule occurs " 'where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud.' " (*Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909, 410 N.E.2d 55, quoting *Roda v. Berko* (1948), 401 Ill. 335, 340, 81 N.E.2d 912.) In *Zaborowski v. Hoffman Rosner Corp.* (1976), 73 Ill. App. 3d 21, 356 N.E.2d 653, the court elaborated on the exception by stating that a false promise made with the intent not to keep it is not enough to trigger the exception. The totality of the circumstances must show a scheme or device to defraud, and the fraud must be pled with specificity. 43 Ill. App. 3d 21, 25, 356 N.E.2d 653.

In the present case, the allegation of fraud is predicated on the three post-dated October checks issued by defendants to plaintiff in August 1981, presumably for payment of meat delivered in June and July 1981. It is undisputed that the checks constituted a promise to perform a future act, *i.e.*, to have sufficient funds in the corporate bank account on the dates set forth on the checks to cover the amounts stated thereon. In fact, both plaintiff and defendants characterize the checks as "promissory notes." At trial, the court placed a great deal of emphasis on the fact that when October 26 arrived, there were insufficient funds in the account. In our view, this fact is irrelevant. There is nothing in the record to indicate that at the time the checks were issued in August, the defendants did not intend to have sufficient funds in the corporate account in October. However, even if defendants had fully intended not to have sufficient funds in their account on the October dates, pursuant to the general rule enunciated by the Illinois Supreme Court in *Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912, a promise to perform a future act, even though made with the intention not to perform, does not constitute fraud.

With respect to the exception to the general rule, plaintiff claims that the three post-dated October checks were part of an on-going scheme to defraud plaintiff of monies due on account. The record belies this contention. Al LaValle, plaintiff's president, admitted that late payment had been an established course of conduct between the parties for over 20 years. LaValle further admitted that he understood that when he received post-dated checks from defendants that defendants did not have sufficient funds to cover the checks at the time of issuance. In addition, LaValle explained that, on occasion, it took several attempts to get payment on post-dated checks. However, plaintiff was eventually paid. The only checks that were never honored for payment were the three post-dated October checks, which became due on or after the date of the fire. In support of its contention that the three checks constituted a scheme to defraud, plaintiff relies on *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 408 N.E.2d 782. In our view, *Alexander* is factually distinguishable and unpersuasive. In *Alexander*, plaintiff and defendant entered into a contract whereby defendant agreed to install a set of truck scales on plaintiff's farm by a certain date. The installation was not completed as promised and plaintiff suffered damages as a result. Plaintiff then sued defendant for breach of contract and fraud.

At trial, defendant admitted that he had breached the contract by failing to timely install, but argued that the trial court had erred in allowing evidence of other transactions in which he had been involved to establish fraudulent intent. Defendant further admitted that at the time he had entered into the contract with plaintiff, he was reasonably certain that he could not meet that date. Two persons with whom defendant had previously contracted for similar work also testified that defendant had failed to meet the completion dates in their contracts. The *Alexander* court found that the testimony regarding prior contractual relations was admissible to show common *modus operandi* and defendant's likely intent at the time of entering into the contract and concluded that the false promise constituted the scheme necessary for a cause of action in fraud.

In the present case, the record is void of any evidence to show that at the time the post-dated October checks were issued in August 1981, defendants intended that the checks would not be honored in October. In further contrast to *Alexander*, there is also no evidence in the present case of a pattern or scheme of nonpayment perpetrated by defendants on plaintiff or any other supplier. The post-dated October checks were the only checks that were never honored. In our view, these checks do not constitute a scheme by defendants to de-

fraud plaintiff.

Further evidence of the lack of a scheme to defraud plaintiff is the undisputed fact that checks, post-dated to September 1981, totalling $17,066.37, issued by defendants to plaintiff contemporaneously with the post-dated October checks had been honored and paid. Plaintiff claims that the September checks were "a mere tactical ploy to placate International and to continue the fraud." The record does not support this characterization of the payments. It is our opinion that the September payments directly counter allegations of a scheme and that the custom and practice of payment established between the parties negates any claims of fraudulent conduct.

Based upon the aforementioned and viewing all of the evidence in the light most favorable to plaintiff, we find that the evidence so overwhelmingly favors defendants that the verdict against them as to count III (common law fraud) cannot stand. Therefore, we conclude that the trial court erred in not granting defendant's motion for judgment n.o.v. as to count III and its concomitant awards of actual and punitive damages. In view of our disposition of count III, we further reverse the trial court's judgment which awarded prejudgment interest.[2] Finally, our decision obviates the need to address defendants' remaining contentions regarding the alleged prejudicial actions of the trial court.

For the foregoing reasons, we reverse the judgments of the circuit court of Cook County and remand the cause with directions that a judgment n.o.v. in favor of defendants Bill Bockos and Harry Bockos be entered on count III.

Reversed and remanded with directions.

QUINLAN, P.J., and O'CONNOR, J., concur.

---

[2]We note that the jury's verdict as to count 1 which determined that Bill and Harry Bockos were not personally liable for Key Wests' corporate debts mandates that any liability of the corporation be pursued solely against Key West.