(No. 54095.—

MAIN BANK OF CHICAGO, Appellee, v. JEROME BAKER *et al.* (Baker, Bourgeois and Associates *et al.*, Appellants; Main Automated Services, Inc., *et al.*, Appellees).

*Opinion filed September 30, 1981.*

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellants.

Darryl M. Fohrman and Joel M. Hurwitz, of Fohrman, Lurie, Sklar & Cottle, Ltd., of Chicago, for appellees Main Bank and Main Automated Services.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The plaintiff, Main Bank of Chicago, brought an action in the circuit court of Cook County against the defendants, Jerome Baker and Lee Bourgeois, to recover on a note. The defendants, together with their wholly owned corporation Baker, Bourgeois and Associates, Inc. (BB&A), counter-claimed against plaintiff and Main Automated Services, Inc. (MAS), seeking recovery on a lease with MAS. MAS is a subsidiary of Main Corporation, which is also the parent corporation of the plaintiff bank. The defendants presented before the jury evidence offered to show that the Main corporations acted as a single entity, and that there were other agreements between the parties upon the perform-ance of which defendants' note payments were condi-tioned. It was stipulated that Lee Bourgeois, who had declared bankruptcy, had signed the note, that it was valid, and that he had defaulted. Following defendant Baker's testimony in which he also admitted executing the note and defaulting on it, the trial judge directed a verdict for the plaintiff bank in the amount of $81,122.36 and costs plus $18,000 in attorney fees. The trial court also directed a verdict against the defendants on the counterclaim. On appeal by defendants, the appellate court initially reversed the trial court, but modified that opinion on rehearing,

affirming the directed verdicts, but reversing and remanding for further consideration of the attorney fees granted by the trial court. (88 Ill. App. 3d 28.) The issues before us are whether the trial court correctly directed a verdict for the plaintiff on the note and against the defendants on the counterclaim, and we thus are obliged to view the evidence in its aspects most favorable to the defendants. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.

Defendant Baker met the president of Main Bank, Sidney Taylor, in 1970 to discuss the possibility of setting up a computer-service bureau for commercial customers. Following negotiations, it was agreed that Baker and Bourgeois, who were in the business of providing data-processing services, would organize and operate the computer-service bureau incorporated by Taylor as MAS. The defendants owned 20% of the stock of MAS but were to receive 50% of its profits. Main Corporation held the remaining 80% of the stock and received 50% of the profits. This arrangement was to allow the expected losses from MAS's first three years of operation to be offset by the profits of Main Bank in a consolidated tax return for a substantial tax savings. Baker became president and chief operating officer of MAS, and Taylor became its chairman. Taylor was a principal shareholder of Main Corporation and both president and chairman of the board of Main Bank.

Negotiations culminated in a 1971 management agreement between MAS, signed by Taylor, and BB&A, signed by Bourgeois, which provided that BB&A would utilize its computer expertise to manage and operate the data-processing activities of MAS. Specific functions of BB&A and its compensation were set out. BB&A was considered an independent contractor under the agreement, which was to remain in effect for 10 years.

MAS operated for more than two years by leasing computer time from other businesses after normal working hours. Baker testified that following a feasibility study the

parties then agreed to purchase a computer which would be installed on the second floor of the bank. On July 20, 1973, Main Bank loaned Baker and Bourgeois money to purchase the computer at a cost of $283,096. They personally executed the note promising to pay Main Bank $382,180 in 78 monthly payments of $4,549.76, with a final balloon payment of $27,298.72. On July 27 defendants entered into a lease agreement with MAS by which MAS leased the computer equipment for $4,692.62 per month with an option to purchase the equipment at the end of the lease for $28,000. The lease covered the same period as the note, with the lease payments due on the 28th day of each month and the note payments due on the 10th day of the following month. The computer equipment and the lease agreement were pledged as collateral security for the note. Baker testified that, though there was an integration clause in the lease stating that it was the only agreement between the parties and their note to the bank made no reference to the payments thereon being connected with the lease agreement, the note and lease were part of what was essentially a single transaction designed to gain a tax advantage for Baker and Bourgeois in the purchase of the computer equipment.

In a letter on Main Bank stationery dated November 26, 1973, Taylor, as chairman of the board of MAS, notified BB&A that the management agreement would be terminated by MAS as of November 30 because BB&A had "been for some time in default in the performance of the contract in several substantial and serious areas." The record is unclear as to the nature of the "default," but in an affidavit referred to by the appellate court in a related suit by Baker on that agreement (*Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909), Baker stated that MAS was having a cash-flow problem, and the defendants were told by Taylor that they would have to contribute $50,000 to alleviate the problem. Defendants were unable to

do so, and Taylor shortly thereafter sent the letter terminating the management agreement. Baker testified in the present action that BB&A was instructed to turn over all financial and other records of MAS to Cushman Gray, vice-president of the bank. Gray had no affiliation with MAS.

In the related Baker action, which had been filed in 1974 following termination of the management agreement, the appellate court affirmed the grant of summary judgment against BB&A, but provided that all defendants in that action remain parties upon retrial of the counterclaim issues in this case. (*Baker, Bourgeois & Associates, Inc. v. Taylor* (1980), 84 Ill. App. 3d 909.) The *Baker* case is not relevant to our consideration of this action, except to note that the appellate court's modified opinion in this case, in which it affirmed the directed verdicts in favor of Main Bank and MAS, was inconsistent with its opinion in the *Baker* case, because no petition for rehearing was filed in *Baker*.

Though the management agreement was terminated and Baker had sued thereon, MAS continued to make payments under the lease agreement until October 1977. The defendants alleged in their counterclaim that MAS was in default under the terms of the lease on November 2, five days after the October 28 payment had been due. Defendants had continued their note payments to that time. The procedure previously followed by defendants was to deposit the lease payment in their account and then write a check for the note payment, and when the lease payments stopped, they had insufficient funds to make the note payments.

In their answer to the complaint, defendants admitted defaulting on the note, but alleged affirmatively that the note payments were conditioned upon receipt of the lease payments, and they were therefore no longer obligated on the note. In their counterclaim defendants alleged that the Main corporations, through their agents, acted and represented themselves to defendants as a single entity, and that

the management agreement, the lease agreement and the note were all parts of a single transaction. They further alleged breach of the lease agreement and sought the unpaid balance. Plaintiff, answering the counterclaim, denied that it acted as a single entity with the Main corporations, denied entering into any agreement with defendants except for the note, and alleged that MAS was the only party obligated on the lease. Plaintiff admitted that MAS stopped making its payments on the lease, but alleged affirmatively that pursuant to the security agreement in which defendants pledged the lease as collateral for the note, plaintiff now possessed the sole right to receive the payments under the lease. Defendants replied, admitting executing the security agreement but denying that they unconditionally pledged the lease agreement as collateral.

The plaintiff's evidence consisted of the testimony by its president, James Tosto, who succeeded Sidney Taylor as president and chief operating officer of the bank in 1973. The note and security agreement were introduced in evidence, and it was established that the amount due on the loan was reduced by the proceeds of the computer sale by the bank pursuant to the security agreement. The stipulation by Lee Bourgeois in which he admitted the validity of the note and his default thereon was also introduced by the bank. Bourgeois admitted the validity of the lease and security agreement as well, but he did not recall any discussions with officials of Main Corporation concerning the purchase of the computer. The tax deductions he was able to take for depreciation of the computer and interest payments on the note were also stipulated.

Baker was the only witness presented on behalf of defendants. He testified concerning the negotiations with Taylor to set up MAS and later to purchase the computer. The lease was admitted into evidence, and Baker testified that when MAS defaulted and defendants were unable to continue their payments, the computer was sold at auction

by the bank. The only testimony by Baker concerning a defense to the suit on the note was that he had negotiated closely with Taylor in his various capacities with Main Corporation, Main Bank and MAS on the management agreement, the note and the lease agreement. Defendants do not contend that there is any ambiguity in any of the written agreements.

On cross-examination Baker stated that he was represented by an attorney when the management agreement was entered into, that there were integration clauses in both the management agreement and the lease declaring the entire agreement to be contained therein, and that there was no written agreement regarding the computer purchase or that the payments on the lease were a condition precedent to payments on the note, stating that those agreements were verbal. He admitted receiving the tax benefits from the purchase of the computer.

The trial court found there was no evidence establishing any agreement other than the written contracts, that the parties had operated at arm's length, and that there was no misrepresentation made to the defendants. After directing a verdict for Main Bank on the note and on the counterclaim, the trial judge noted some difficulty regarding a finding as to MAS, and the following exchange took place:

"THE COURT: *** I have found no evidence that you have been able to establish on that counterclaim to show there is any money due and owing at the present time. You haven't attempted to establish anything after resting your case. Now, I am prepared to have you produce any further evidence you may want, to be able to establish that claim if you wish. But on the other claims, I am making my directed finding.

Do you have any further evidence you want to produce?

[DEFENDANT'S ATTORNEY]: No, your Honor.

THE COURT: All right. Then with no further

evidence the Court's going to direct both counter-claims ***."

In our judgment the trial court did not err in directing a verdict for the plaintiff on the note. The principal defense was that the note was conditioned upon the performance of other agreements between the parties, a defense dependent entirely upon impermissible parol evidence for its proof.

In some circumstances parol evidence may be considered to aid in the interpretation of a contract (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283; 9 Wigmore, Evidence § 2470 (3d ed. 1940)), and such evidence may be admissible to invalidate a contract under certain circumstances (*e.g., State Bank v. Cirivello* (1978), 74 Ill. 2d 426 (incomplete instrument); *Bell v. McDonald* (1923), 308 Ill. 329 (conditional delivery); *Van Buskirk v. Day* (1863), 32 Ill. 260 (fraud); Restatement of Contracts § 238 (1932)), but parol evidence is otherwise inadmissible to vary or contradict the clear written provisions of an integrated contract (*Kendall v. Kendall* (1978), 71 Ill. 2d 374; *Scholbe v. Schuchardt* (1920), 292 Ill. 529; Restatement (Second) of Contracts §§ 239, 241 (Tent. Draft Nos. 1 through 7 1973)). The terms of the note clearly bind defendants, Baker and Bourgeois, to monthly payments until the note is paid. The evidence of Baker that there were oral agreements making the lease payments a condition precedent to the note payments directly conflicts with the written terms of both the note and the lease, and parol evidence is inadmissible to show that an obligation under a note, absolute on its face, is conditional. (*Walker v. Crawford* (1870), 56 Ill. 444; *Houck v. Martin* (1980), 82 Ill. App. 3d 205; Ill. Ann. Stat., ch. 26, par. 3—413, Illinois Code Comment (Smith-Hurd 1963).) Even if the note had indicated the lease payments as a source from which reimbursement would be expected, the otherwise unconditional promise to pay would not thus be made conditional. (*Rhodes v. Schofield* (1955), 263 Ala. 256, 261, 82 So. 2d 236,

240; *First National Bank v. Lightner* (1906), 74 Kan. 736, 739, 88 P. 59, 60; *Bank of Viola v. Nestrick* (1979), 72 Ill. App. 3d 276, 279; Ill. Rev. Stat. 1979, ch. 26, par. 3—105(1)(f).) The promise could be made conditional if the instrument states that it is subject to or governed by another agreement (*People v. Gould* (1932), 347 Ill. 298, 301; Ill. Rev. Stat. 1979, ch. 26, par. 3—105(2)(a)), or states that it is to be paid *only* out of a particular fund or source (*Wright v. Board of Public Instruction* (Fla. 1955), 77 So. 2d 435; *First National Bank v. Sullivan* (1911), 66 Wash. 365, 119 P. 820; Ill. Rev. Stat. 1979, ch. 26, par. 3—105(2)(b)). There is no provision in the note which states that it is subject to the lease agreement or that it is to be paid *only* out of the proceeds of the lease payments, and the parol evidence is not admissible for the purpose of converting the unconditional promise to a conditional one.

Baker argues, however, that the management agreement, note and lease were executed as part of the same transaction and, therefore, pursuant to section 3—119 of the Uniform Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 3—119), should be construed together. It is essentially his position that, construing these instruments together in light of the circumstances under which they were executed, the jury could have found that continuation of the management agreement and payments under the lease agreement were *implied* conditions precedent to his obligation on the note.

Section 3—119 of the Uniform Commercial Code provides:

> "As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction * * *."

(Ill. Rev. Stat. 1979, ch. 26, par. 3—119.) This section applies the general rule to negotiable instruments that courts will look to the entire contract in writing and thus construe instruments executed as a part of the

same transaction, between the same parties, for the same purpose, as a single agreement. *H. F. Philipsborn & Co. v. Suson* (1974), 59 Ill. 2d 465, 472; *Nelson v. John B. Colegrove & Co. State Bank* (1933), 354 Ill. 408; Ill. Ann. Stat., ch. 26, par. 3—119, Uniform Commercial Code Comment 3 (Smith-Hurd 1963).

Accordingly, as between the same parties, a note may be affected by a separate *writing*, including an agreement that upon certain conditions the instrument shall be discharged or is not to be paid. (Ill. Ann. Stat., ch. 26, par. 3—119, Uniform Commercial Code Comment 3 (Smith-Hurd 1963).) Parol evidence is admissible for the purpose of establishing that the instruments were executed as part of the same transaction. *Stookey v. Hughes* (1856), 18 Ill. 55; *Sudeikis v. Chicago Transit Authority* (1980), 81 Ill. App. 3d 838, 841.

Unlike article 2 of the Uniform Commercial Code, article 3 of the Code does not state general rules as to when an instrument may be varied by parol evidence, except to the extent indicated by section 3—118 (Ill. Rev. Stat. 1979, ch. 26, par. 3—118). This section states basic rules of construction applicable to instruments in the case of an ambiguity so as to preclude a resort to parol evidence. However, under well-established pre-Code law in Illinois, evidence of *oral* agreements made at the same time an instrument is executed is not admissible to vary an instrument's terms even as between the original parties (*e.g., Mumford v. Tolman* (1895), 157 Ill. 258), and such evidence remains inadmissible under the Code (Ill. Ann. Stat., ch. 26, par. 3—119, Illinois Code Comment (Smith-Hurd 1963)). Thus, although article 3 of the Code allows an instrument to be modified by a separate writing executed contemporaneously, consistent with the policy of promoting certainty and security in commercial transactions, it otherwise follows the parol evidence rule that prior or collateral oral agreements are inadmissible to contradict the express terms of a written

instrument. *Continental Bankers Life Insurance Co. v. Bank of Alamo* (Tenn. 1979), 578 S.W.2d 625.

A review of the record demonstrates that the evidence did not support the premise that defendants' obligation on the note was linked to the management agreement. To the contrary, at the time the management agreement was executed, the prospect of making a computer purchase in the future was speculative, depending upon when it would be financially feasible. We agree with the appellate court that although the parties were aware of the import of the management agreement at the time the note and lease were executed, the management agreement was executed two years earlier and was not made in anticipation of the note and lease agreement. Moreover, defendants' subsequent conduct in making payments on the note for four years following termination of the management agreement negates any belief on their part that the continuation of the management agreement was a condition precedent to payment on the note. Any contingency would, therefore, have to rise by construing the note and lease agreement as constituting the same transaction.

Section 3—119 of the Code contemplates a situation in which the *same* parties contemporaneously execute an instrument and a separate written agreement. Thus, as a preliminary matter, defendants' evidence would have had to support their "single entity" theory, since MAS was the lessee under the lease and the Main Bank was the payee on the note. Assuming, however, that the note and lease agreement could be construed as a single transaction between the same parties, the lease does not alter, modify, limit, explain or otherwise affect the terms of the unconditional promissory note (*Sturgis National Bank v. Harris Trust & Savings Bank* (1933), 351 Ill. 465, 478); there is no reference whatsoever in the lease to the note or computer purchase. Therefore, even if the jury could have construed the two documents together, it would have had to rely on

impermissible parol evidence to supplement the terms of the written contracts. (*Texas Export Development Corp. v. Schleder* (Tex. Civ. App. 1974), 519 S.W.2d 134.) Thus, defendants' contention that an implied contingency arises by construing the note and lease agreement as one transaction is unsupportable because such an implication can arise only as a result of the inadmissible parol evidence.

A further argument is made that the note was delivered for a special purpose. (Ill. Rev. Stat. 1979, ch. 26, par. 3—306(c).) Though Baker's testimony would tend to indicate that the two separate transactions relating to the note and lease were related, there is no evidence to support the contention that the note was delivered by defendants for any "special purpose" other than as the unconditional promise of the defendants to repay the loan with interest. The burden of proving such a defense rests on defendants, and there is nothing in this record warranting submission to the jury of the question of whether the note was delivered for the type of special purpose contemplated by the law as a defense to the note.

Baker also asserts that the bank unjustifiably impaired the collateral for the note by cancelling the management contract. (Ill. Rev. Stat. 1979, ch. 26, par. 3—606(1)(b).) This defense under the Code does not apply to makers or co-makers (*Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975), 62 Ill. 2d 16), and the record does not establish that Baker acted as other than a co-maker in signing the note.

It is further argued that good faith was not exercised by Taylor as an agent for the bank. The trial judge found to the contrary, however, and we cannot say that finding is contrary to the manifest weight of the evidence.

The final defense asserted under the UCC was partial failure of consideration (Ill. Rev. Stat. 1979, ch. 26, par. 3—408). The consideration for the note was the payment by the bank of the money borrowed to purchase the computer. It is undisputed that defendants received the full amount

recited as consideration in the note. As indicated earlier, there is nothing other than the inadmissible parol evidence to indicate any conditional connection between the note payments and the lease payments, and termination of the lease payments was not a failure of consideration for the note. While the evidence did establish the several parties and the several agreements were not totally unrelated, that evidence was insufficient to create a jury question on the asserted defenses to the action on the note. Consequently, the directed verdict thereon was correct.

In their counterclaim against the Main Bank, the defendants seek to disregard the separate corporate existence of MAS and hold the bank liable under the lease agreement. The lease was entered into between defendant and MAS. Indeed, Baker, as president of MAS, signed the lease as lessee as well as signing in his individual capacity as lessor. Yet, he argues that the trial court erred in directing a verdict for the bank on the counterclaim because he asserts the evidence was overwhelming that the "Bankers" tricked him and Bourgeois into signing the note and otherwise used the corporate form to manipulate them. In view of the unity of interest between Taylor, Cole and the Main corporations, Baker asserts that Illinois case law requires the corporate fiction to be disregarded. We cannot agree.

It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be affiliated. (*Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594.) Stock ownership alone in one corporation by another does not create an identity of interest between the two or create the relation of principal and agent, representative, or alter ego between the two. Nor does the use of common officers and directors of itself render one corporation liable for the obligations of another. (*Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282.) These practices are common and exist in most

parent-subsidiary relationships. (*Steven v. Roscoe Turner Aeronautical Corp.* (7th Cir. 1963), 324 F.2d 157, 161.) Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. *People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29; *Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594, 603-04; *Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282, 294; see generally Annot., 38 A.L.R.3d 1102 (1971).

While, ordinarily, when multiple corporations are involved, a party seeks to pierce the corporate veil to hold a parent liable for its subsidiary's acts or the subsidiary responsible for the acts of its parent, defendants seek to hold the plaintiff bank liable for its affiliate's breach of contract. However, the doctrine of piercing the corporate veil is not limited to the parent and subsidiary relationship; the separate corporate identities of corporations owned by the same parent will likewise be disregarded in an appropriate case. *C. M. Corp. v. Oberer Development Co.* (7th Cir. 1980), 631 F.2d 536, 539; *In re Bowen Transports, Inc.* (7th Cir. 1977), 551 F.2d 171, 179.

The only evidence presented by defendants in support of their counterclaim was Baker's testimony, which we believe was insufficient to warrant submission to the jury of the single-entity theory. The evidence clearly supports the trial court's findings that the parties operated at arm's length, that there was no evidence of a misrepresentation of any kind, that no one attempted to deceive defendants or conceal anything under corporate names, and that Baker, who was represented by counsel, had a total understanding of all of the transactions. Nor was there any evidence which indicated that MAS failed to maintain adequate corporate

records or to comply with corporate formalities, that it was undercapitalized, or that corporate funds were commingled.

Baker's own testimony established that he was fully cognizant of MAS's separate corporate existence; Baker and Bourgeois owned 20% of MAS's stock and received 50% of its profits, and Baker himself acted as president and agent of MAS, fostering that image and inducing others to deal with it on a corporate basis. (*Bankers Trust Co. v. Chicago Title & Trust Co.* (1980), 89 Ill. App. 3d 1014, 1021.) Indeed, it was Baker who signed on behalf of MAS the lease agreement he now seeks to hold the bank liable under. Baker cannot assert the equitable doctrine of piercing the corporate veil to disregard the separate corporate existence of a corporation he himself created to gain an advantage which would be lost under his present contention. *Bevelheimer v. Gierach* (1975), 33 Ill. App. 3d 988, 993; *Earp v. Schmitz* (1948), 334 Ill. App. 382.

Baker's assertion that Taylor controlled both MAS and Main Bank and was therefore acting on behalf of the bank when he proposed the computer purchase scheme is unsupportable (*Loewenthal Securities Co. v. White Paving Co.* (1932), 351 Ill. 285, 294-96). Baker's testimony did not establish that Baker believed the Main Bank would be responsible for the lease payments in the event of MAS's default. At most, it established that the discussions concerning the computer purchase, loan and lease agreement took place at the same time, and it was Taylor who suggested that Baker and Bourgeois buy the computer and take the tax advantage. But Baker was not in any way misled as to the substance of the transactions; he testified that the computer purchase was set up in the manner indicated because of the resulting tax advantage that inured to him and Bourgeois.

Baker's reliance on the events which took place subsequent to the lease agreement is misplaced. The fact that following termination of the management agreement he

was told to turn over all the records of MAS to Cushman Gray, a vice-president of the bank, does not negate the circumstances under which the lease agreement was made.

In summary, defendants' evidence was insufficient to warrant submitting to the jury the issue of whether the plaintiff bank was liable for the contract of its affiliate MAS. Accordingly, the directed verdict on the counterclaim in favor of the Main Bank is affirmed. However, the directed finding in favor of MAS on the lease agreement was error.

The lease was admitted into evidence and clearly established the obligation on the part of MAS to pay for the use of the computer. Baker's testimony and the admissions of the parties established that lease payments stopped October 28, 1977, and that MAS was thus in default on the lease. The trial court seemed to believe that a directed verdict for MAS was warranted because Baker did not name a dollar amount due him following the default. That holding was error. The amount of each payment was specified in the lease, and the number of payments due during the remaining life of the lease could be readily determined based upon the date of default. A simple computation would indicate the amount due the defendants. The trial court should have allowed the jury to determine whether the breach by MAS was justified, and, if not, the amount of damages suffered by defendants. We note that the effect of the security agreement in which the lease was pledged as collateral was not addressed below. If it is found to give the bank the right to payments under the lease agreement, since the payments on the note and those under the lease were not identical, the amount of any discrepancy must be determined. We accordingly reverse the directed verdict for MAS on the counterclaim.

In awarding attorney fees the trial court made no finding as to the portion expended in recovering on the note itself, to which the bank is clearly entitled. It is not,

however, entitled to recover from defendants the portion attributable to the balance of the litigation.

That portion of the appellate court judgment affirming the directed verdicts for the Main Bank on the note and the counterclaim is affirmed; that portion of the appellate court judgment affirming the circuit court's directed verdict for MAS on the lease is reversed; the judgment of the appellate court reversing the award of attorney fees is affirmed. The cause is remanded to the circuit court for further proceedings consistent herewith.

*Appellate court affirmed in part and reversed in part; cause remanded.*

MR. JUSTICE SIMON took no part in the consideration or decision of this case.