GENE HANNAH, Plaintiff-Appellant, v. MIDWEST CENTER FOR DISABILITY EVALUATION, INC., *et al.*, Defendants (Marshall Matz, Defendant-Appellee).

First District (2nd Division)   No. 1—87—3346

Opinion filed March 21, 1989.

Drumke & Patterson, Ltd., of Chicago (Robert B. Patterson and Danielle M. Jaeschke, of counsel), for appellant.

Joseph P. Switzer and Susan J. Flieder, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff brought this action against defendants to recover damages for their allegedly misrepresenting to a claims adjustment firm the medical opinion of plaintiff's treating physician. The trial court granted defendant Marshall Matz' motion for summary judgment after determining that there was "not one shred of evidence presented to [him] in the file that indicate[d] that Matz had anything to do with these events." A motion for summary judgment brought against plaintiff by Cullen and Midwest was denied by the circuit court. On plaintiff's appeal, the issue is whether the court properly awarded summary judgment to Matz in light of his motion, the materials in

support thereof, and the inferences reasonably to be drawn therefrom.

Having suffered a series of three injuries to his lower back, plaintiff sought workers' compensation benefits from his employer, Nehi Royal Crown Corporation (Nehi). Nehi was self-insured and utilized the services of the Martin Boyer Company to investigate and adjust plaintiff's claims; Robert Shapin was the Martin Boyer claims agent administering plaintiff's case.

In the course of his treatment by various physicians, plaintiff was hospitalized repeatedly and underwent surgery on his lower back twice. Shapin, as is permitted by Illinois law, had plaintiff examined twice by Matz, a neurosurgeon of Martin Boyer's choice, for evaluations as to disability. Matz first saw plaintiff on February 13, 1980, and reported his findings to Martin Boyer on his medical service corporation letterhead: M.I. Matz, M.D., and D.M. Shenker, M.D., S.C. Matz was not plaintiff's treating physician. Plaintiff was then under the care of Dr. W. Patrick Smyth, but on February 21, 1980, he came under the treatment of Dr. Dale Vachout, who thereafter remained his doctor for the entire period pertinent to this case.

During the year 1980, plaintiff received rehabilitational counseling from a Mr. Pindelski of International Rehabilitation Associates (IRA), who, during the period of such counseling, helped plaintiff obtain a job as an inventory control person and bottle labeler. IRA's services were provided at the request of plaintiff's counsel, and Martin Boyer approved payment therefor; but IRA's efforts proved unsuccessful when plaintiff became incapable of performing the duties required of him in his new position.

In November 1980, plaintiff underwent a laminectomy performed by Dr. Hernando Torres, and after a period of post-operative recovery, plaintiff saw Matz for his second medical evaluation. Immediately following the examination, Matz reported his findings to Martin Boyer in a letter written on his medical service corporation letterhead—the same procedure that he followed after the first examination.

In February of 1981, Shapin referred plaintiff to the Midwest Center for Disability Evaluation, Inc. (Midwest), for rehabilitation services. Andrea Cullen was the specialist at Midwest assigned to handle plaintiff's rehabilitation program; Matz was the owner and incorporator of Midwest, which was not legally formed until December of 1980 and did not begin to do business until January 1, 1981.

On March 19, 1981, plaintiff attempted to return to work at Nehi as a checker, a position that involved counting merchandise contained in trucks before they left Nehi's premises. However, he was physically

unable to perform the tasks required by this job, as it demanded bending, climbing and twisting, so he left work that day and saw or spoke to Dr. Vachout on March 20, 1981.

On March 20 or 21, 1981, Cullen had a telephone conversation with Shapin, during which she reported that she had spoken with Dr. Vachout, who informed her that plaintiff had a psychological motivation not to return to work—essentially "pain for gain," as she characterized it. She further reported that Dr. Vachout held the opinion that continued vocational rehabilitation was useless, that plaintiff would not return to work until his case was settled, and that plaintiff was not a "permanent total." She wrote a report, dated March 23, 1981, to Shapin which included the statements allegedly made by Dr. Vachout. As a result of Cullen's report, Shapin told her to close the file and cease rehabilitation. Dr. Vachout denied making the statements.

Plaintiff then filed suit against Cullen, Midwest, and Matz, alleging in essence that their false reporting of Dr. Vachout's statements resulted in the wrongful termination of plaintiff's workers' compensation benefits and in his loss of future opportunities for employment. Neither of the two counts of the complaint alleges that Matz is liable as Cullen's employer under a *respondeat superior* theory, but that Matz himself had either negligently misrepresented Dr. Vachout's opinion to Martin Boyer, or had willfully participated in or authorized Cullen's false report. Matz filed an answer denying all allegations of wrongdoing. The issue on appeal, therefore, is whether there was sufficient evidence to raise a genuine issue of material fact concerning Matz' personal involvement in the alleged misconduct.

Matz' motion for summary judgment alleges that he was not a participant or otherwise involved in Cullen's false reporting of Dr. Vachout's opinion. Cullen denied ever speaking with Matz regarding plaintiff. Accompanying his motion was Matz' affidavit stating that Midwest, a corporation of which he was founder and president, provided rehabilitation services and counseling and employed Cullen as a rehabilitation consultant; that a separate medical service corporation, M.I. Matz, M.D., and D.M. Shenker, M.D., S.C., of which Matz was an officer and employee, provided neurosurgical and neurological treatment; that the physicians at the medical service corporation treated their own patients and evaluated injured persons, such as the plaintiff, at an employer's or its representatives' request, while no such services were available at Midwest; that his medical service corporation was located in a separate office than that of Midwest; that he had no keys to Midwest; that he did not refer any patients to Midwest; that Cullen maintained Midwest's office records and its tele-

phone service; that Cullen made all rehabilitation decisions on her own, and he had never reviewed any of her rehabilitation reports; that he had no right to control the performance of Cullen's duties as a rehabilitation consultant; that he did not participate in any decisions relating to rehabilitation services provided to the plaintiff and that he had never provided plaintiff with any rehabilitation services; and, finally, that his two examinations of the plaintiff were performed not for rehabilitation purposes but to evaluate the plaintiff's neurological condition pursuant to the provisions of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*).

It also appears from the other materials filed in the summary judgment proceeding that Matz as sole shareholder was the only person who stood to profit from Midwest's operations and that he held all of its operating authority, including the right to hire and fire employees; that as treasurer of the corporation, Matz maintained the bank account for Midwest at the North Bank in Chicago, and that he held the checkbook and signed all checks; that Midwest printed a promotional brochure entitled, "Back To Work," which stated that Midwest's rehabilitation services were "totally unique among our competition" because "we combine vocational and medical rehabilitation," and that "we're staffed to see, evaluate and treat if necessary"; and that the brochure spoke of the "M.C.D.E. medical staff" as well as "consulting doctors."

In addition, Midwest's stationery used for Cullen's report of March 23, 1981, lists Marshall I. Matz, M.D., in the section which identifies employees of the company. The "Consulting Staff" is listed below the employee section, but does not include Matz' name. Both Matz and Cullen stated in their depositions that Matz occasionally would participate in examining and evaluating Midwest clients that Cullen referred to him, and that although Matz examined plaintiff on February 18, 1981, at Shapin's request, the examination was not connected in any way with Midwest's rehabilitation services. Matz asserted that he was not aware of the circumstances under which plaintiff was referred to Midwest; Cullen stated that Shapin referred plaintiff to Midwest through a telephone conversation and, as already noted, that she did not speak with Matz regarding plaintiff. In some referral situations, Martin Boyer would send Cullen or Midwest a referral sheet, in which Martin Boyer "could" request particular services, such as job placement; however, Martin Boyer did not send a referral sheet for plaintiff.

Plaintiff charges that Matz was personally involved in the rehabilitation program administered by his solely owned rehabilitation service

company, Midwest, contending that when one considers "the small size of Midwest," and "Matz's total control over Cullen," especially "in the absence of a credible denial by both of them, a jury could well find, based on the factual circumstances, that Matz necessarily had to know and approve of Cullen's misconduct in falsely reporting Dr. Vachout's opinion to Shapin/Martin Boyer." Plaintiff further maintains that the trial judge "narrowly focused" his granting of Matz' motion for summary judgment "on whether there was direct evidence showing that Matz participated in the authorship of the false reports of March 20 or 23, 1981," made by Cullen; thus, he was "deprived of the reasonable inferences which a jury could draw from the totality of the circumstances."

■ Only the existence of a genuine issue of material fact will preclude the granting of summary judgment. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867.) The trial court must construe the motion, pleadings and supporting materials strictly against the moving party and liberally in favor of the opponent. A party moving for a summary judgment must affirmatively show a clear legal right, free from any doubt. If any facts upon which reasonable persons may disagree are identified, or if inferences which may be reasonably drawn from those facts lead to different conclusions, the court must deny the motion and direct that the resolution of those facts and inferences be made at trial. *Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 515 N.E.2d 1047.

Plaintiff asserts that there are several questions of fact raised by the "conflicting" testimony of Matz and Cullen and the documentary evidence verified by the affidavit of plaintiff's attorney, Kenneth S. Lewis. Plaintiff contends that although Matz claimed in his motion for summary judgment that he was in no way involved in the rehabilitation services provided to him by Midwest, the notes taken by Ed Mikel, a paralegal employed by Lewis, of a February 19, 1981, telephone conversation he had with Cullen demonstrate that Matz told her that plaintiff needed rehabilitation and that Matz would suggest it in his report. The suggestion does not appear in Matz' report.

Plaintiff raises these other instances of alleged inconsistencies based upon some of the interactions between Cullen, Matz and Shapin: first, plaintiff refers to Cullen's testimony that she never talked to Matz concerning Hannah, which he brands as plainly false. Plaintiff alleges that Matz did not deny that he discussed plaintiff's rehabilitation program with Cullen, but claims only that he could not recall one way or the other. Therefore, plaintiff contends that a genuine issue of material fact exists concerning the extent to which Matz did discuss

plaintiff's rehabilitation program with Cullen.

Second, plaintiff insists that a substantial question of fact arises as a result of the method by which his February 18, 1981, examination by Matz was arranged, charging that the absence of a referral sheet from Martin Boyer was out of the ordinary. Plaintiff also suggests that evidence of the absence of a referral sheet in combination with Cullen's lack of recollection as to why plaintiff was referred to Midwest could cause a jury to conclude that the arrangements of his rehabilitation program occurred in discussions between Matz, Shapin and Cullen at a date prior to Matz' examination of plaintiff on February 18, 1981.

Third, pointing to the Midwest "Back To Work" brochure, plaintiff indicates that it states that the evaluation process begins with a medical evaluation by the "primary physician or by one of our medical staff." Plaintiff finds it odd that Dr. Vachout, as plaintiff's primary physician, was not asked to perform an evaluation of the plaintiff. He further contends that it may be inferred from Mikel's notes of February 19, 1981, that Matz immediately thereafter called Cullen and suggested rehabilitation for plaintiff. Plaintiff adds that Matz was identified on the letterhead of Midwest in a section which identifies employees of the company, as opposed to consultants, arguing therefrom that a jury could find it more probably true than not that Matz was chosen as the evaluating physician at some time before February 6, 1981, that Cullen knew of this, and that Matz' evaluation on February 18, 1981, was intended to refute his providing rehabilitation to plaintiff.

Fourth, plaintiff alleges that "Matz's inability to recall pertinent details of plaintiff's involvement with Midwest appears conveniently motivated by his self-serving desire to divorce himself from any connection with the plaintiff."

Plaintiff entreats this court to believe that these alleged inconsistencies would allow a jury to draw a reasonable inference that Matz was involved in the making of Cullen's false report and that such an inference is the only rational explanation of Cullen's misconduct in fabricating Dr. Vachout's opinion.

Plaintiff further exhorts us that the determination of the extent of Matz' involvement in plaintiff's rehabilitation program, the likelihood of Matz' participation in wrongdoing from the time the initial program was instituted, and the likelihood that Cullen hardly acted alone are matters for resolution by a jury, stoutly insisting that a jury should be allowed to hear defendant's testimony and adjudge its credibility.

■ The parties are in agreement that for an officer or director of a close corporation to be liable for the tortious act of a corporate employee, the officer or director must have actively participated in or personally authorized the specific act of the employee. (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 204, 427 N.E.2d 94; *Fure v. Sherman Hospital* (1977), 55 Ill. App. 3d 572, 371 N.E.2d 143.) Matz emphasizes that the record unequivocally establishes that he neither actively participated in nor personally authorized Cullen's report; and, noting that status, association, speculation, and assumption do not and cannot make a corporate officer liable for the wrongful acts of a corporate employee, the trial court properly entered summary judgment in his favor. We agree.

■ Merely to set forth in this opinion, as we have, a compendium of the evidence and a liberal representation of plaintiff's arguments, all of which the trial court had before it in ruling on Matz' motion for summary judgment, is to prompt the suggestion that, after making due allowance for all *reasonably possible* inferences, mere speculation cannot be permitted to perform duty for probative facts. As the court held in *Consolino v. Thompson* (1984), 127 Ill. App. 3d 31, 468 N.E.2d 422:

> "Where from the proven facts the nonexistence of the fact to be inferred appears to be just as probable as its existence (or more probable than its existence), then the conclusion that it exists is a matter of speculation, surmise, and conjecture, and a jury will not be allowed to draw it." (*Consolino*, 127 Ill. App. 3d at 34, quoting James, *Sufficiency of the Evidence & Jury-Control Devices Available before Verdict*, 47 Va. L. Rev. 218, 221-22 (1961).)

Here, the record is barren of any evidence as to why Cullen falsely represented Dr. Vachout's opinion to Shapin, nor is there anything from which it can reasonably be inferred that Matz participated in or authorized the preparation or transmittal of the disputed report.

The record in this case consists of 686 pages and indicates that extensive, if not plenary, discovery was had by both sides, including the taking of the depositions of Cullen, Matz, Shapin, Lewis and plaintiff, as well as the filing of voluminous exhibits and sworn answers to extensive interrogatories. From this profusion of materials, plaintiff has managed to submit to this court two briefs steeped in sheer speculation, suffused with gross suspicion and shrouded in a most unedifying host of incriminating accusations, as witness his lacing his arguments with such assertions as: "the absence of a *credible* denial by Matz and Cullen"; "Cullen's testimony that she never talked to Dr.

Matz about Gene Hannah is *plainly false*"; "Cullen was caught in her own *lie*"; "A jury, using its experience in the ordinary affairs of life, could well find that some *corrupt* scheme was underway"; "Isn't plaintiff entitled to have defendants explain this *strange arrangement* to a jury?"; "The circumstances of the two telephone conversations of February 20, 1981, also strongly infer [*sic*] an early pattern of *false* representations"; "Dr. Matz's demonstrated *lack of credulity* on important factual questions"; "Plaintiff can show material *misstatements* under oath by Dr. Matz and Cullen"; "A Jury is not bound to accept the obviously *untrue* denials of Matz's involvement made by Cullen and Matz"; "[Matz] *probably* condoned or directed Cullen's wrongful conduct"; and "defies *credulity* and \*\*\*, *appears far fetched.*" (Emphasis added.)

Opposition to a motion for summary judgment grounded on such bare assertions, unsupported by any probative facts or by any authority, provides the court with only the *dramatis personae* and the plot line for a novel of Byzantine intrigue, for it is clear that at most, since he has already deposed defendants as on cross-examination, plaintiff is only asserting his desire for a further opportunity to "shake" the sworn testimony they have already given. But he must point to specific facts, or to *reasonable* inferences from the facts, or to some particularized ground for the possible impeachment of defendants in order to prevent the entry of summary judgment against himself—mere incantatory invocations of "credibility," in light of the record in this case, do not suffice. Surely, plaintiff, as the burdened party, should not be permitted to avoid summary judgment and advance to trial under the facts in this case merely by suggesting that defendant's affidavits and sworn discovery testimony are false. Such a rule would make a mockery of the summary judgment procedure, for it would obviously increase delay and expense in the final disposition of litigation and would thus exacerbate the very problem the procedure was devised to solve.

Nor can Matz be held personally liable for the wrongdoing of one of Midwest's employees simply because his company is a small one. (See *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004, 415 N.E.2d 560.) Plaintiff cites no authority, nor do we find any, which authorizes our courts to impose liability under the facts developed in this case.

We hold that the trial court properly granted defendant Matz' motion for summary judgment. We find no evidence which even dimly suggests linking Matz with Cullen's false representation of Dr. Vachout's opinion. Status, association, speculation, suspicion, accusa-

tions, surmise, conjecture and assumption do not and cannot make a corporate officer or director liable for the wrongful conduct of a corporate employee; much less do they permit our courts to submit allegations of his conduct to a jury accompanied by nothing in the way of proof thereof save the possibility that his denial may be disbelieved. Our courts do not exist for the purpose of affording litigants the opportunity to turn them into gaming dens.

Accordingly, the trial court's award of summary judgment to defendant Matz is affirmed.

Affirmed.

EGAN, P.J., and BILANDIC, J., concur.