2020 IL App (3d) 180724

Opinion filed March 17, 2020
Modified Upon Denial of Rehearing June 12, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| DIANA ANGELL, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-18-0724 |
| | ) | Circuit No. 16-L-0232 |
| SANTEFORT FAMILY HOLDINGS LLC, | ) | |
| d/b/a Tri-Star Estates, | ) | The Honorable |
| | ) | Raymond Rossi, |
| Defendant-Appellee. | ) | Judge, presiding. |
| | ) | |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

_____

**OPINION**

¶ 1      Plaintiff Diana Angell fell and was injured while touring a mobile home located at Tri-Star Estates in Bourbonnais, Illinois. She filed suit against Santefort Family Holdings, LLC (defendant), which owned the real-estate property where Tri-Star Estates is located. Defendant filed a motion for summary judgment, arguing that it did not own the mobile home at issue. The trial court granted defendant's motion, and Angell filed a motion to reconsider, requesting leave to file an amended complaint. The trial court denied the motion to reconsider. Angell appealed,

arguing the trial court erred (1) in granting defendant's motion for summary judgment, (2) in denying her leave to file an amended complaint, and (3) in failing to pierce defendant's corporate veil. We reverse and remand for further proceeding.

¶ 2                                    I. BACKGROUND

¶ 3        On April 21, 2014, Diana Angell and her mother toured the inside of a mobile home at 38 St. Michaels Drive, in Tri-Star Estates, a mobile home park in Bourbonnais, Illinois. Angell was interested in buying or renting it. She walked into an unlit bathroom and stepped into an uncovered vent hole. As a result, Angell was seriously injured.

¶ 4        Angell obtained a title search for Tri-Star Estates, determined that defendant was its owner, and filed suit against that entity. In her complaint, she alleged that defendant carelessly and negligently removed a vent cover from the floor of the bathroom of the mobile home and neither replaced it nor warned her of the open hole. She also alleged that Santefort was negligent in that its agent showed her the bathroom of the mobile home without turning on the light.

¶ 5        In its answer, defendant objected to the question regarding whether it owned, occupied, leased, managed, or controlled the mobile home at the time of Angell's injury. Defendant contended that the question called for a legal conclusion or was otherwise vague. But, without waiving its objection, defendant denied owning the property. Defendant also objected to the question asking it to identify the entity that owned the mobile home, if Defendant was not the owner. Instead, defendant stated: "Santefort Family Homes, LLC did not own, manage, occupy, or lease the unit ***." Defendant also denied that it had any "leases, contracts or similar agreements *** with regard to the" mobile home.

¶ 6        Defendant listed Brian Gallagher as its Chief Operating Officer and Chief Financial Officer. At his deposition, Gallagher testified that the Santefort Family 2012 Irrevocable Trust

(irrevocable trust) owned Santefort Real Estate Group, LLC, which in turn owned and operated defendant. Gallagher was also the chief operating officer of Santefort Real Estate Group, LLC. There were at least 11 companies related to the irrevocable trust, each set up as a separate legal entity and managing a specific home community or apartment building.

¶ 7 Gallagher explained that the separate entities exist to facilitate the operations of the irrevocable trust. He believed this structure was "very common in residential real estate," as a lending industry requirement, stating:

> "Much of it is driven by lenders, and it's industry standard practice that lenders would want to have single-purpose entities and not multiple types of businesses regarding commercial or residential real estate. And so the lenders who provide mortgages to the property, that allow us to acquire properties with debt instead of all equity, expect the owner of that property to be a single-purpose entity for purposes of knowing that they can pursue that collateral directly without any other businesses being involved.
>
> As a result, we are required, and they expect us to have a separate management company, and they expect us to have a separate sales company, because they don't want, in the event of default, bankruptcy laws provide a simpler path to recovering their collateral than if there are other businesses involved in the single-purpose entity."

¶ 8 Gallagher was also the chief operating officer of Santefort Property Management, Inc. ("SPMI"), whom defendant hired under this structure to manage properties within the umbrella of the irrevocable trust. He admitted that it was "hard to keep track of" all the various entities

3

and managing companies. Therefore, Santefort Services, LLC was created on January 1, 2016 to centrally pay the employees of the entire organization through a single entity, Santefort Services, LLC. Gallagher explained that Santefort Services, LLC is "really dedicated to processing the payroll for the entire organization ***. So, everyone in the company is now paid by Santefort Services, LLC."

¶ 9    Neither defendant nor SPMI sold the mobile homes on defendant's property. Another entity, Midwest Home Rentals, LLC (Midwest), owned the mobile homes on the property. Midwest was "affiliated" with defendant but was solely responsible for the acquisition and sale of the mobile homes. Midwest's personnel handled the sales whereas SPMI's employees managed the property. Gallagher was also the chief operating officer of Midwest.

¶ 10    Gallagher admitted that "the operations, the revenues and expenses of operating the property [were] recorded on the books of Santefort Family Holdings," the named defendant in this case. He did not believe that defendant owned the mobile home where Angell was injured. He explained that when defendant bought the property "any home that came with it would have been assigned to" Midwest. By "assigned," he clarified, "Sold or transferred it. Not given it." He was unsure whether the assignment of each of home was memorialized "with specific paperwork or not." He believed it might have been done "with an accounting entry."

¶ 11    Gallagher testified that he investigated Angell's injuries and the circumstances of her fall. He recalled speaking with Michael Quam, a salesperson for Midwest, and Jeff Justice about their knowledge of her fall. According to Gallagher, Quam told him that he was showing Angell the mobile home when she walked away from where he was leading the tour. She then stepped into an open vent hole in the bathroom.

¶ 12        At his deposition, Michael Quam stated he was a sales assistant for Midwest and reported to Gallagher. While he was giving Angell a tour of the mobile home, she walked toward one of the bathrooms another Quam heard her scream. He found her with her leg in an uncovered vent hole. He called an ambulance because he felt that Angel was in "bad shape." He testified that he never spoke with Gallagher about this incident. Linda Quam, Michael Quam's wife, was also deposed. She worked for Midwest as a sales manager and reported to Gallagher. She said that repairs on the homes located at Tri-Star Estates, where Angell was injured, were contracted out and not done by SPMI or Midwest. Gallagher had hired both Michael and Linda Quam.

¶ 13        Defendant filed a motion for summary judgment, arguing that it did not own the mobile home at issue and, therefore, owed Angell no duty of care. Angell responded, arguing in part that Defendant was liable for the tort of Midwest under the doctrine of piercing the corporate veil. Alternatively, she requested leave to amend her complaint under Section 2-616(d) of the Illinois Code of Civil Procedure to add Midwest as a defendant. She did not include a proposed motion. One day before its response was due, Defendant submitted a supplemental answer to discovery with three attachments: (1) a tax bill for the year of 2014 on the mobile home naming "Mary Nemitz" as owing the unpaid bill, (2) an assignment of mortgage from TCF National Bank to Midwest, dated December 31, 2013, and (3) a certificate of title last recorded on January 27, 2007, naming Janet Warhover as the owner of the mobile home. The following day, defendant filed its reply to Angell's response.

¶ 14        The trial court granted defendant's motion for summary judgment on July 24, 2018. It ordered the case dismissed with prejudice. Angell timely filed a motion for reconsideration, which the trial court denied on November 13, 2018. Angell timely filed a notice of appeal.

¶ 15        This appeal now follows.

¶ 16                                       II. ANALYSIS

¶ 17          On appeal, Angell argues that the trial court erred in granting defendant's motion for summary judgment. Alternatively, Angell argues that the trial court erred in denying her motion for reconsideration and denying her leave to amend her complaint.

¶ 18          We review a grant of summary judgment *de novo*. *Jackiewicz v. Vill. of Bolingbrook*, 2020 IL App (3d) 180346, ¶ 23. Summary judgment is appropriate only if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at ¶ 22 (Internal quotation marks omitted). We review the record in "strictly against the movant and liberally for the nonmovant." *Id.* at ¶ 23. The movant need not prove her case but, to survive the motion, she "must present a factual basis that would arguably entitle [her] to judgment." *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 70 (2008) (Internal quotation marks omitted). Illinois courts thus should grant summary judgment only where the movant's right to it "is clear and free from doubt." *Id.*

¶ 19          The parties' arguments on appeal regarding defendant's motion for summary judgment reflect their arguments before the trial court. Defendant contends that Midwest was the owner of the mobile home, that defendant is a separate legal entity from Midwest, and that defendant had no ownership interest in the mobile home. For these reasons, defendant argues that it owed no duty of care to Angell. In response, Angell asserts that defendant and Midwest are "inextricably linked" and that the entities "function as a single business" under the Santefort Family 2012 irrevocable trust umbrella. She thus argues that the doctrine of piercing the corporate veil should apply to find defendant liable for Midwest's tort. We agree with Angell and reverse the trial court's grant of summary judgment.

¶ 20    In Illinois, "[t]he doctrine of piercing the corporate veil is an equitable remedy." (Internal quotation marks omitted.) *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500 (2005). It "is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." (Internal quotation mark omitted.) *In re Rehabilitation of Centaur Insurance Co.*, 238 Ill. App. 3d 292, 300 (1992), *aff'd*, 158 Ill. 2d 166 (1994). It allows courts "to pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." (Internal quotation marks omitted.) *Gajda v. Steel Solutions Firm, Inc.*, 2015 IL App (1st) 142219, ¶ 23. Veil-piercing occurs "almost exclusively in closely held corporations." *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 11. But, as an equitable remedy, the doctrine "looks to substance rather than form." *Fontana*, 362 Ill. App. 3d at 501.

¶ 21    As a preliminary matter, defendant argues that the doctrine is inapplicable to it because it is not a shareholder of Midwest. We disagree. "Although piercing the corporate veil is often used to reach the assets of an individual for conduct of a corporation, courts may pierce the corporate veil of two affiliated or 'sister' corporations." *Gajda*, 2015 IL App (1st) 142219, ¶ 24 (citing *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1025 (2007)); *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205 (1981) (noting separate identities of corporations "owned by the same parent will likewise be disregarded in an appropriate case"). For the reasons stated below, we hold that defendant and Midwest are affiliates of the Santefort Family 2012 irrevocable trust and are subject to the doctrine of piercing the corporate veil.

¶ 22    Courts are reluctant to pierce the corporate veil. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 65. Accordingly, a party asserting the doctrine has the burden of making a substantial showing that the entities are not separate and distinct. *Id.* The asserting party will be successful

7

where "(1) there is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." (Internal quotation marks omitted.) *Gajda*, 2015 IL App (1st) 142219, ¶ 23. To determine if there is a unity of ownership and interest, we consider

> "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders." (Internal quotation marks omitted.) *Id.* ¶ 24.

¶ 23    We "will not reverse the finding of the trial court regarding piercing the corporate veil unless it is against the manifest weight of the evidence." *Fontana*, 362 Ill. App. 3d at 500. However, we do so here under the framework of a motion for summary judgment, reviewing the evidence *de novo* in the light most favorable to the nonmoving party. *Corrigan*, 382 Ill. App. 3d at 70. We conclude that the manifest weight of the evidence shows that defendant and Midwest were not acting as separate and distinct entities when Angell was injured.

¶ 24    Gallagher's testimony shows that the two entities exist only to facilitate the operations of the irrevocable trust. He stated that commercial real estate industry lenders require property owners to be single-purpose entities. He explained that this requirement is in place to take advantage of the "bankruptcy laws," allowing for "a simpler path to recovering their collateral

8

than if there are other businesses involved in the single-purpose entity." Under the irrevocable trust's structure, defendant owns the real-estate property, Midwest owns or holds the home as inventory for sale, and SPMI manages the property. Defendant contends that this structure is more than a mere façade. We disagree. Defendant provides no support, beyond Gallagher's testimony, establishing the existence of a lending industry requirement. But even if there were such a requirement, it cannot insulate defendant from the obligations of: observing corporate formalities; maintaining separate funds; and having different and independent officers from Midwest. Defendant has failed on all these factors, blurring the lines between itself and Midwest.

¶ 25    First, defendant and Midwest have the same corporate officer. Gallagher is the Chief Operating Officer for both entities, presumably managing both entities. He hired Linda and Michael Quam as salespersons at Midwest; they reported directly to him. He was also defendant's Chief Financial Officer, while being the Chief Operating Officer of its owner, Santefort Real Estate Group, LLC.

¶ 26    Second, Gallagher's testimony supports the conclusion that the entities failed to maintain an arm's length relationship. In addition to his positions in the various entities, Gallagher referred to defendant and Midwest as a single "organization." He admitted that it was hard to keep track of the entities. He also testified that the transfer of the homes between defendant and Midwest "might have [been] done *** with an accounting entry." Such means of transfer would only be possible where the entities maintain the same accounting records. Gallagher's testimony further supports this conclusion. He testified that Midwest owned the property where Angell was injured. However, he testified that revenues from the property were recorded in defendant's accounting books. He also testified that defendant filed the taxes on the property.

9

¶ 27    Defendant argues that this Court should not rely on Gallagher's testimony regarding the transfer of homes because he was unsure of it. But if true, Gallagher's uncertainty shows that the entities failed to maintain proper corporate records. Gallagher was both the Chief Financial Officer for Defendant and the Chief Operating Officer for Midwest. If the transfer of homes was made between the two entities, he would have been able to determine how it was done.

¶ 28    Defendant asks instead that we look to the documents submitted in its supplemental answer to discovery, contending they showed that Midwest owned the mobile home at issue during the relevant time period. We disagree. The documents create more confusion than clarity. The certificate of title was from eight years before Angell's fall and referred to a person yet to be shown relevant in this case. Although it has "Midwest Home Rentals, LLC" written at the bottom, we have no way of knowing when this inscription was made or for what purpose. The tax bill, on the other hand, does not seem to relate to either entity. Arguably the assignment of mortgage might be indicative of ownership. But even so, it does not cure the entities' failure to maintain separate corporate identities.

¶ 29    Finally, the record also shows that there was a comingling of funds between defendant and Midwest. We note again Gallagher's testimony regarding the recording of Midwest's property on Defendant's books and further consider his assertion that the employees of defendant and Midwest were paid from a single payroll system created under the umbrella of the irrevocable trust. Although he believed this system was created on January 1, 2016, after Angell's fall, he stated that the organization did so to streamline the previous arrangement. When viewed in the light most favorable to the nonmoving party, this suggests that the entities funds were comingled before January 1, 2016. We also note that Gallagher's various executive

10

positions within the organization support our conclusion that the funds were comingled and centrally managed before January 1, 2016.

¶ 30    The manifest weight of the evidence here, when reviewed *de novo* and in the light most favorable to the nonmoving party, shows that defendant and Midwest are so inextricably linked that they cannot be considered separate entities. In fact, the record shows that the two entities, together with SPMI, are affiliated or sister entities under the Santefort Family 2012 irrevocable trust. We therefore hold that applying the doctrine of piercing the corporate veil to disregard the separate legal identities of defendant and Midwest is appropriate in this case. Therefore, we reverse the trial court's grant of defendant's motion for summary judgment.

¶ 31    The dissent argues that "no fraud or injustice exists here," and therefore affirming the grant of summary judgment is proper. We disagree. If defendant was the wrong party named in the suit, it had all the information necessary to alert Angell of this fact when it filed its answer to the complaint. However, defendant waited until after Gallagher's testimony to submit the necessary information. And again, defendant waited until a day before filing its reply in the summary judgment to submit evidence it alleges shows Midwest's ownership of the evidence. Finally, even Gallagher's testimony regarding the organization's structure suggests an attempt at creating confusion and shielding various groups from liability. The dissent also argues that without a judgment in Angell's favor, the doctrine of piercing the corporate veil is inapplicable. The dissent is incorrect. The doctrine is applicable as "a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." (Internal quotation marks omitted.) *In re Rehabilitation of Centaur Insurance Co.*, 238 Ill. App. 3d at 300.

¶ 32    Because of our ruling, we need not address Angell's argument that the trial court erred in denying her leave to amend the complaint to add Midwest as a defendant. However, we note that nothing in our ruling precludes the amendment of Angell's complaint on remand.

¶ 33                                    III. CONCLUSION

¶ 34    The judgment of the circuit court of Will County is reversed, and the cause is remanded for further proceedings.

¶ 35    Reversed and remanded.

¶ 36    JUSTICE SCHMIDT, dissenting:

¶ 37    The party attempting to pierce the veil of a legal entity has the burden of making a substantial showing that the entity was so controlled or manipulated it had become a mere alter ego of another. *Supra* ¶ 22. Here, plaintiff needed to make such a *substantial* showing. Reading the majority's analysis, one would assume that the financial records, corporate records, accounting records, and other crucial documents related to the legal entities involved are present in the record on appeal. They are not.

¶ 38    Instead, the majority takes plaintiff's burden upon itself leaving defendant to rebut its *post hoc* analysis. It finds Gallagher's various positions within the entities supports this conclusion *Id.* Also, that he is "presumably" managing both entities. *Supra* ¶ 25. However, common officers and directors among entities alone is inadequate to pierce the veil. *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204-05 (1981). "These practices are common and exist in most parent-subsidiary relationships." *Id.*

¶ 39    The majority goes on to find that the entities failed to maintain an arm's length relationship and maintain proper corporate records. *Supra* ¶¶ 26-27. This is based on Gallagher's testimony alone followed by speculation by the majority and not a substantial showing by plaintiff. Without

accounting or corporate records to verify its assertion, the majority *assumes* the entities have maintained records improperly. The majority also asserts Gallagher admitted that it was hard for him to keep track of the various entities involved in this matter. *Supra* ¶ 26. A review of the testimony reveals that it was plaintiff's counsel that expressed difficulty in identifying between the entities, not Gallagher. Moreover, after reviewing defendant's petition for rehearing, I agree that the majority made additional factual errors. Namely, presuming Gallagher managed both Midwest and Santefort Holdings when plaintiff admits in her reply to defendant's motion for summary judgment that Thomas Santefort is the manager of Midwest; this is further supported by documentation from the Illinois Secretary of State identifying Thomas Santefort as the manager of Midwest.

¶ 40       As the final support for piercing the veil, the majority states the "record also shows that there was a comingling of funds[.]" *Supra* ¶ 29. Within the same paragraph, it only finds that the record when viewed in the light most favorable to plaintiff "suggests" comingling. *Id.*

¶ 41       While seizing on Gallagher's deposition testimony as the linchpin of its analysis, in some respects the majority refuses to accept Gallagher's unrebutted testimony that the commercial real-estate lending industry requires property owners to be single purpose-entities. It does not explain this refusal except to say that defendant has provided no support for this proposition. *Supra* ¶ 24. Defendant has no such burden.

¶ 42       Further, there must be evidence that "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204-05 (1981). I cannot find any evidence that Midwest was undercapitalized or stripped of its assets at the time of this suit. Had plaintiff sued the proper defendant, presumably she would have received any compensation awarded. No fraud or injustice exists here. The analysis

13

above fails to convince me there has been a substantial showing by the plaintiff that requires piercing of the veil.

¶ 43    The fact of the matter is this, plaintiff's counsel failed to name the correct party in this suit. During Gallagher's deposition the following exchanges took place:

"Q: Okay. Who owned the trailer back in April of 2014?

A: I believe it would have been Midwest Home Rentals.

***

Q: So when the accident happened, Santefort Family Holdings, LLC, would have owned that trailer?

A: No. Midwest Home Rentals would have owned it."

As demonstrated in the deposition excerpt above, plaintiff was aware she was suing the wrong party 8 months before defendant filed for summary judgment. Defendant also alerted plaintiff she was suing the wrong party 11 months prior to the filing for summary judgment by denying ownership of the mobile home in response to plaintiff's interrogatories. This flies in the face of the majority's assertion that defendant waited a day before filing a reply in the summary judgment proceedings to alert plaintiff she was suing the wrong entity. *Supra* ¶ 31. Armed with the knowledge she was suing the wrong party, plaintiff pushed onward without attempting to amend. Compounding this error, plaintiff failed to file a motion for leave to amend her complaint. These errors prevented relation back to name Midwest as a party. See 735 ILCS 5/2 616 (d)(3) (West 2018) (requiring amended pleadings to be filed with the court to relate back). If plaintiff would have filed a motion for leave to amend with the proposed amended pleading, she would likely have been able to establish Midwest had constructive notice and relation back to her original complaint. See *Owens v. VHS Acquisition Subsidiary No. 3, Inc.*, 2017 IL App (1st) 161709, ¶ 45.

14

¶ 44        What my colleagues do above is not "a means of imposing liability on an underlying cause of action," but instead is a way to overcome plaintiff's failure to follow proper procedure and give her another bite at the apple. *Supra* ¶ 20. In that way, the doctrine of piercing the veil has been improperly turned into a cause of action in this case. See *Gajda*, 2015 IL App (1st) 142219, ¶ 19. The majority rewards plaintiff's legal errors. It is not our job to act as plaintiff's attorneys. Affirming the court's grant of summary judgment would not result in fraud or promote injustice.