JACK F. SURIANO *et al.,* Plaintiffs, v. EMI SERVICES CORPORATION *et al.,* Defendants (EMI Services Corporation, Counterplaintiff-Appellee; David L. Shaw, Counterdefendant-Appellant).

First District (1st Division)   No. 1—88—1543

Opinion filed February 27, 1989.—Rehearing denied May 22, 1989.

Robert G. Cook, Jr., of Chicago, for appellant.

James L. Poznak, of Bishop & Crawford, Ltd., of Oak Brook, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

This appeal arises from an action brought by employee-stockholders of EMI Services Corporation (EMI) against EMI, alleging misrepresentation of EMI's financial position in connection with the redemption of stock and sale of assets. EMI brought a counterclaim against employee-stockholder David Shaw, alleging failure to repay a loan for the purchase of stock pursuant to an employee stock purchase plan. EMI moved for summary judgment on the counterclaim, which was granted. Shaw appeals the summary judgment while the underlying case proceeds. For the reasons below, we affirm the summary judgment and order that enforcement be stayed until entry of a final judgment in the underlying case.

EMI is a consulting and engineering firm. In 1970, EMI's original four shareholders executed a stock purchase agreement (the 1970 agreement). Paragraphs 1 and 2 of the 1970 agreement restricted the

shareholders' sale of EMI stock except to EMI. Paragraph 4 required redemption of stock by EMI where stockholder was an employee and his employment ended for the reasons specified. Paragraph 8 defined the value of the stock for purposes of purchase or redemption by EMI. Paragraph 13 provided that, as long as any part of the purchase price of stock purchased or redeemed by EMI remained unpaid, EMI was required to employ an independent certified public accountant to prepare annual financial statements. Paragraph 14 set forth specific conditions that constituted default under the agreement by EMI, which included the failure to comply with paragraph 13. Paragraph 15 provided for a restrictive endorsement on all stock issued pursuant to the agreement, which stated:

> "This certificate is transferable only upon compliance with the provisions of an agreement dated September 1, 1970, between the shareholder named herein and EMI Corporation, a copy of which is on file in the office of the Corporation, or any revision of the agreement as mutually arrived at by the shareholder and EMI Corporation at a subsequent date."

EMI grew and subsequently provided an employee stock purchase plan through which each employee could purchase up to 5,000 shares of EMI. All EMI shareholders were employees. On April 15, 1981, David Shaw bought 5,000 shares of EMI stock through the employee purchase plan. Two documents were executed by Shaw, a loan agreement (the loan agreement) and a stock purchase agreement (the 1981 agreement).

The loan agreement stated in relevant part:

> "[T]he best interests of [EMI] and [Shaw] would be served by offering a loan to said employee for the purchase of 5,000 shares of stock as per stock purchase agreement with EMI Corporation. The employee loan to Mr. Shaw of $39,200.00 represents 5,000 shares of stock at $7.84 per share, which will be used by [Shaw] as collateral on this loan. The hereby agreed upon simple rate of interest will be five and one half percent (5½%), and the expiration date for repayment of loan is April 15, 1986."

The 1981 agreement provided the mechanism for purchase of stock by employees and EMI's redemption of the stock. Paragraph 2 provided that the price for shares bought by the employee would be the amount of "Stockholders Equity" divided by the number of shares outstanding. Shaw purchased the stock at $7.84 per share, a price that is not disputed. Paragraph 3 provided that the redemption price would be the amount of "Stockholders Equity" as defined in para-

graph 2, calculated at the end of the fiscal quarter preceding the date of redemption. Paragraph 4 provided that the employee had the option to purchase the shares either by cash or by payroll deductions. Paragraph 7 restricted sale of the stock by the employee except to EMI. Paragraphs 8 and 9 required redemption of stock by EMI where employment was severed due to death, retirement, termination for cause, or permanent disability. Paragraph 10 required that where EMI purchased stock from an employee, or redeemed it, the price would be determined by paragraph 3. Paragraph 11 provided a restrictive endorsement on all stock issued pursuant to the agreement, which stated:

> "This certificate is transferable only upon compliance with the provisions of an agreement dated December 31, 1976, between the Employee named herein and EMI Corporation, a copy of which is on file in the office of the Corporation, or any revision of the agreement as mutually arrived at by the Employee and EMI Corporation at a subsequent date."

The parties agree that the December 31, 1976, agreement referred to in the endorsement does not exist. The endorsement of the 1981 agreement differed from the endorsement in the 1970 agreement only in the date and the substitution of "Employee" for "Shareholder." The stock certificate issued to Shaw carried an endorsement that used the term "Employee," but was otherwise identical to the endorsement provided in the 1970 agreement:

> "This certificate is transferable only upon compliance with the provisions of an agreement dated September 1, 1970, between the Employee named herein and EMI Corporation, a copy of which is on file in the office of the Corporation, or any revision of the agreement as mutually arrived at by the Employee and EMI Corporation at a subsequent date."

By the end of May 1983, declining business had forced EMI to terminate all of its employees, obligating it to redeem the employees' shares. EMI negotiated redemption at a price of $5.67 per share with all employee shareholders but Shaw. In mid-October 1983, a special meeting of shareholders was called to consider the sale of EMI's assets. Shaw and other shareholders dissented and filed the underlying action, alleging fraud, misrepresentation, and breach of fiduciary duty, and sought to determine the fair value of EMI stock.

On May 19, 1986, EMI filed a counterclaim against Shaw based on the loan agreement, alleging that Shaw had failed to repay the obligation by April 15, 1986. On April 24, 1987, EMI moved for summary judgment on the counterclaim, which was granted on June 15,

1987. On July 15, 1987, the trial court ordered Shaw to pay the outstanding balance on the loan plus interest. A motion to vacate was denied. Shaw appeals.

Shaw argues that the loan agreement was conditioned upon the 1981 agreement, and that when EMI allegedly misrepresented the value of its stock for redemption at the end of May 1983, it defaulted on a condition of the loan, extinguishing Shaw's obligation. Shaw further argues that the value of the stock as of the end of May 1983 remains a material issue of fact, defeating summary judgment. EMI responds that the loan agreement was unconditional and that the value of the stock was irrelevant to the summary judgment. An examination of the law shows that EMI is correct.

■ Shaw first contends, correctly, that because the loan agreement and the 1981 agreement were executed contemporaneously as part of the same transaction, they should be construed as one document. (*Sudeikis v. Chicago Transit Authority* (1980), 81 Ill. App. 3d 838, 401 N.E.2d 1114, *appeal denied* (1980), 81 Ill. 2d 588; *Tepfer v. Deerfield Savings & Loan Association* (1983), 118 Ill. App. 3d 77, 454 N.E.2d 676, *appeal denied* (1984), 96 Ill. 2d 572.) But Shaw concludes, incorrectly, that if the documents are construed together, then the provisions of the 1981 agreement were conditions to the loan agreement. The 1981 agreement required EMI to redeem stock at a price determined according to paragraph 3 of the agreement, and Shaw contends that because EMI allegedly misrepresented the stockholders' equity, it defaulted on the 1981 agreement, thus failing to meet a condition to the loan agreement.

Shaw's contention is without merit, however, because the loan agreement must be construed as unconditional. Construing the loan agreement and the 1981 agreement together, meaning only that any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of the other will be given effect (*Sturgis National Bank v. Harris Trust & Savings Bank* (1933), 351 Ill. 465, 184 N.E. 589; *2140 Lincoln Park West v. American National Bank & Trust Co.* (1980), 88 Ill. App. 3d 660, 410 N.E.2d 990), it is clear that the obligation of one was not intended to be made conditional upon the terms of the other. The only reference to the 1981 agreement in the loan agreement is the language "as per stock purchase agreement," and the 1981 agreement makes no reference to the loan agreement. The loan agreement evidences Shaw's debt to EMI and his undertaking to repay the debt at a specified rate of interest within a definite time. The 1981 agreement embodies the offering of stock to employees and the provisions for purchase or redemption of the stock by EMI. The

two documents, although comprising one transaction, govern altogether different subjects and give no indication that Shaw's obligation to pay the loan was conditioned on the provisions of the 1981 agreement.

Shaw further argues that EMI's intention to treat the loan agreement as conditional was indicated in a letter to Shaw from EMI director and majority stockholder Edward Milligan, dated July 15, 1983, which referred to payment of the loan and the redemption of shares as "mutual obligations," and by references to the 1981 agreement in a second letter, dated November 29, 1983. EMI argues that Shaw waived his right to rely on the letters because they were not presented until his motion to vacate the summary judgment.

Shaw's argument concerning the effect of the letters is not, as EMI argues, waived, but the purpose for which they may be reviewed is limited. Because Shaw's argument concerning the letters was raised for the first time in a post-judgment motion, the standard of review is not whether the trial court erred in its construction of the documents as a matter of law, but whether the trial court abused its discretion in denying the motion to vacate. (See *Rahill Corp. v. Urbanski* (1984), 123 Ill. App. 3d 769, 776-77, 463 N.E.2d 765.) The letters were in Shaw's possession, or known to him prior to the summary judgment, but not presented, and the letters are not so conclusive or decisive as to make probable that a rehearing would render a different result. (*Rahill,* 123 Ill. App. 3d at 777.) The trial court did not abuse its discretion in denying Shaw's motion to vacate.

More importantly, the letters cannot support Shaw's conclusion that because the loan agreement and the 1981 agreement should be construed together, the loan obligation was conditional. Parol evidence is admissible to show that documents should be construed together, but is inadmissible to show that an obligation, unconditional on its face, is conditional. *Main Bank v. Baker* (1981), 86 Ill. 2d 188, 199, 427 N.E.2d 94.

Shaw also asserts that the 1970 agreement should be construed as part of the transaction that generated the loan agreement and the 1981 agreement, relying on references to the 1970 agreement in the Milligan letter of November 29, 1983, and the restriction on Shaw's stock certificate, which refers to the 1970 agreement. Were the. 1970 agreement part of the same transaction, EMI's alleged failure to value the stock for redemption according to generally accepted accounting principles would have been an explicit default under the 1970 agreement. Shaw's assertion, however, is unfounded. The 1970 agreement was executed 11 years before the transaction between

EMI and Shaw and cannot reasonably be considered part of the same transaction, even if the 1970 agreement and the 1981 agreement contain similar terms.

Even if the 1970 agreement were part of the 1981 transaction, due to the restriction on Shaw's stock certificate, its only effect would be to limit Shaw's transfer of the certificate, because the so-called "restrictive endorsement," provided for in both the 1970 agreement and the 1981 agreement, is actually an issuer's restriction on transfer, governed by article 8, section 8—204, of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1987, ch. 26, par. 8—204). Restrictive endorsements, however, are governed by article 3, sections 3—205 and 3—206, of the UCC (Ill. Rev. Stat. 1987, ch. 26, pars. 3—205, 3—206), but article 3 applies to negotiable instruments, not to investment securities such as the EMI stock certificate. Shaw's attempt to bootstrap the provisions of the 1970 agreement to the 1981 transaction through references in the letters and the "restrictive endorsement" are without merit. The loan agreement and the 1981 agreement should be construed together, but the loan agreement, on its face, states an unconditional obligation, and no evidence contradicts the unconditional nature of the obligation.

■ Shaw's second argument is that the accurate value of EMI stock at the end of May 1983 remains in dispute, creating an issue of material fact. Shaw depends, however, on the assumption that the loan obligation was conditional. As discussed above, however, the loan obligation was unconditional. The summary judgment was entered on the counterclaim, which alleged that Shaw had breached the loan agreement. The loan was based on the undisputed value of the stock stated in the loan agreement. Any dispute over the value of EMI stock as of May 1983 does not alter the fact that Shaw owed an outstanding balance of the loan and had failed fully to repay it by April 15, 1985. The summary judgment on the counterclaim ordering Shaw to pay the outstanding amount of the loan was proper.

The value of EMI stock at the end of May 1983 remains an issue in the underlying case, however, and will be set off from the amount that Shaw owed on the loan. As a practical matter, either Shaw or EMI will receive, after litigation, the net difference between the amount Shaw owes on the loan and the redemption price. The summary judgment order therefore should be stayed until a final judgment in the underlying case determines at what price the EMI stock should be redeemed.

■ Shaw finally argues that he is entitled to remedies under article 9, section 9—502, of the UCC (Ill. Rev. Stat. 1987, ch. 26, par. 9—

502), which include those provided by the parties' agreement. Shaw relies again, however, on the erroneous assumption that payment of the loan was conditioned on provisions of the 1981 agreement. Moreover, assuming that the 1981 agreement was a security agreement to which article 9 applies, allowing the remedies against EMI on the counterclaim would result in a double recovery by Shaw, since Shaw bases his right to remedies on the counterclaim on the same allegations that support his underlying claim against EMI. Here, Shaw seeks performance by EMI of its obligations under the stock purchase agreements, which he argues would result in a favorable stock price for redemption. Assuming Shaw is correct, such a remedy on the counterclaim would have the same effect as a setoff. As noted above, however, the amount Shaw owes on the counterclaim will be offset by the valuation of the stock as determined in the underlying action. To allow a setoff first on the counterclaim, and then possibly on the underlying action, would constitute an impermissible double recovery. See *Lombard v. Elmore* (1986), 112 Ill. 2d 467, 493 N.E.2d 1063.

In summary, the trial court correctly ruled that no provisions of either the 1970 or the 1981 agreement created conditions to Shaw's obligation under the loan agreement. The value of EMI stock at the end of May 1983 remains an issue in the underlying case and need not be addressed here, but the value of the stock will determine the amount that is set off from Shaw's liability under the loan agreement. Therefore, the summary judgment is affirmed, but the case is remanded to the trial court with instructions to stay enforcement until final judgment in the underlying case.

Affirmed and remanded with instructions.

CAMPBELL and BUCKLEY, JJ., concur.