RONALD S. SAMUELS, d/b/a Washington, Kennon, Hunter and Samuels, Plaintiff-Appellee, v. CHICAGO HOUSING AUTHORITY, Defendant-Appellant (Washington, Kennon, Hunter and Samuels *et al.*, Counterdefendants).

First District (6th Division)   No. 1—90—1607

Opinion filed December 7, 1990.

Schiff, Hardin & Waite, of Chicago (Mark C. Friedlander, Barry S. Alberts, Jay Williams, and Helen T. Wilson, of counsel), for appellant.

Ronald S. Samuels, of Chicago, appellee *pro se.*

JUSTICE EGAN delivered the opinion of court:

On November 22, 1988, the plaintiff, Ronald S. Samuels (Samuels), filed a four-count complaint against the defendant, the Chicago Housing Authority (CHA), seeking to recover unpaid legal fees amounting to $252,866.99; thereafter, the plaintiff filed, then voluntarily dismissed, then refiled a fifth count seeking punitive damages of $2 million from the CHA for alleged willful, malicious, and outrageous conduct involving a scheme to obtain legal services from the plaintiff's firm without paying for such services. The CHA denied that it breached its contract with Samuels' firm, Washington, Kennon, Hunter & Samuels (the firm), and set forth as an affirmative defense that it was entitled to set off $850,000 against any recovery by the plaintiff due to the firm's legal malpractice in handling an unrelated lawsuit against the CHA. The alleged acts of malpractice were charged to Kennon, a member of the firm. On October 19, 1989, the trial judge struck the CHA's affirmative defenses but granted the CHA leave to file a counterclaim for a setoff based on the alleged malpractice.

On November 21, 1989, the plaintiff filed a motion for partial summary judgment of $252,886.99 on two counts of his complaint:

breach of contract and an account stated. The plaintiff based his motion on the CHA's asserted admissions that the contract was made, that services were performed by the firm, that invoices were sent to the CHA, and that defense counsel admitted to the court that the invoices were approved for payment. On January 10, 1990, new counsel appeared for the CHA. They subsequently filed an appearance on January 24, 1990. At the hearing on the motion for summary judgment on January 10, the plaintiff stated, in part, as follows:

"We are just asking Your Honor[,] since we have a question of perhaps *involuntary bankruptcy based upon the failure to pay these outstanding obligations* and the fact that they are admitted[, to grant the motion for summary judgment].
\* \* \*

We suggest to this Court that as we had suggested in Count V of the complaint, that it is the purpose of the CHA, it is the pattern and practice of the CHA not to pay their bills and to extend small vendors into a situation such as the plaintiff is in wherein *he will be placed in involuntary bankruptcy because of failure of the CHA to pay monies* that they have deposited into the \* \* \* Bank saying that if they lose the case, then they will pay." (Emphasis added.)

At the same hearing, the trial judge addressed the CHA's request for an extension of time to file responses to outstanding motions and stated:

"I don't blame Mr. Samuels here, you know. It has just been one constant battle to get the CHA to participate in this litigation to the full extent. \* \* \*

If you people [Schiff, Hardin & Waite, the CHA's new attorneys] are going to have the same problem with [the CHA as that had by Neal Gerber and Eisenberg, the CHA's old firm], get out of this case fast. It is their [the CHA's] fault really. They have been tinkling around with this man all this time. He is entitled to this money or he isn't. He is entitled to have this decided."

The judge granted the plaintiff's motion for summary judgment and simultaneously granted the CHA until February 9 to file a motion to reconsider the order. In responding to the extension of time granted to the CHA, Samuels stated, "What the impact of this will be is to *place the plaintiff in involuntary bankruptcy through no fault of the plaintiff.*" (Emphasis added.)

On February 9, 1990, the CHA did file a motion to reconsider the partial summary judgment, as well as a motion for leave to file a

counterclaim *instanter*, almost four months after the judge had already granted leave to file a counterclaim. The CHA's proposed counterclaim sounded in malpractice, breach of contract, fraud, and racketeering (alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c) (1988) (RICO)) against the firm. Compensatory damages were claimed under the malpractice count to be $837,000; under the fraud count the CHA sought $837,000 in compensatory damages and $1 million in punitive damages; under the RICO count the CHA sought treble damages totalling $2,511,000 plus attorney fees. On March 12, 1990, the trial judge held a hearing on the motion to reconsider. At the hearing, the CHA's counsel made clear that it was not disputing its obligation to pay $173,174.49 of Samuels' claimed fees; however, the CHA maintained that enforcement of a judgment for that amount should be stayed until its counterclaim was resolved. Samuels contended that he had supplied the CHA with proof of insurance coverage and that the CHA knew he had $25 million in malpractice coverage. The CHA disputed these representations.

The judge granted the CHA leave to file its counterclaim *instanter* and stated as follows:

> "I am going to vacate the prior order of summary judgment for [$252,886.99]. I am going to enter today a final order for partial summary judgment on behalf of the Plaintiffs [*sic*] in the amount of [$173,174.49]. I am going to stay the execution and enforcement of that order for thirty days.
>
> In the meantime, after thirty days you can grab the money if you can and you can buy a building with it. The man said that he would be bankrupt *if he didn't get some money out of this thing*; that is what he said, *not that he was bankrupt* but he has all of these people that are after him. So the [$173,174.49] that is owed. Let's get that thing out of this case. Let's get it paid. We will litigate the question of the difference between that and the [$252,886.99] and all of the other stuff later on.
>
> In the meantime, after thirty days you get ahold of Pearl [Insurance Company] and you find out whether there was coverage, because if there is $25 million coverage, I want that money paid fast." (Emphasis added.)

The written order of March 12, 1990, does not address the subject of proof of insurance coverage.

On April 11, 1990, the CHA filed a motion for modification of the March 12 judgment order under section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203) seeking to stay

enforcement of the judgment until final resolution of the CHA's counterclaim. The CHA asserted that Samuels failed to demonstrate that he possessed any insurance coverage applicable to the CHA's counterclaim and instructed his insurance carrier not to produce documents to the CHA. At a hearing on this motion on May 9, 1990, Samuels denied that lack of proof of insurance was an appropriate matter on which to bring a section 2—1203 motion, but nevertheless presented the court with a lawyers' professional liability policy naming Samuels, Kennon, and the firm as insureds; the judge found that the policy evidenced $1 million of coverage for each claim and in the aggregate for the period of August 15, 1984, to August 15, 1985. The judge ruled:

"What's before me today is shall I permit *** the original Plaintiffs to go ahead and try and collect that money. With a judgment entered *** against the Defendant on behalf of Plaintiffs, these Plaintiffs are entitled to their money.

The only argument *** is 'Well, gee, Judge, if you let them collect this money they'll go ahead and they will spend it. They'll blow it. God knows what they will do with it, and we won't be able to collect on the other side.'

If this was an initial suit filed by the CHA against Larry Kennon and Ron Samuels and they wanted me to tie up property of these people, they'd come in here for writ of attachment. You won't get to first base with a writ of attachment in this.

There's no showing here that either of these gentlemen are going to flee the jurisdiction. There's *no showing here that either of these gentlemen are going to be totally impecunious when the time comes to pay this judgment if it has to be paid.*

*And there's no showing that this coverage does not exist,* and I see no reason to stay the enforcement of this judgment. This money is due to these people, and they're entitled to it. Whatever may be recovered later on is a chance you take when you get into litigation." (Emphasis added.)

On May 17, 1990, the CHA filed an emergency motion for reconsideration of the ruling on the section 2—1203 motion and for an order compelling disclosure of insurance coverage. This motion included as an exhibit the proof of insurance presented to the trial judge by Samuels at the earlier hearing. The CHA argued that these materials did not provide proof of insurance but were "merely certificates evidencing *possible* insurance coverage for dates between 8/15/83 to 8/15/84, 8/15/84 to 8/15/85, and 8/15/85 to 8/15/86." (Emphasis in original.)

At the hearing on this motion on May 31, 1990, the CHA argued that "[i]t would make no legal or logical sense" for the court to deny a stay of enforcement after the court had ordered Samuels to produce proof of insurance and he failed to do so. The judge noted that "I was only trying to help you people out to get the documents which I thought were readily available." The judge also noted that *there was no proof that Samuels was financially unstable*, stating "for all I know Mr. Samuels may take his money and wisely invest it in the stock market and be a wealthy man. *** Admittedly, he has debts, but if he pays off his debtors he'll have less debts and he'll have more assets." The judge and parties later stated:

"THE COURT: *** This Court has determined the Chicago Housing Authority owes this man this money. What he is going to do with it, that's his problem. That may ultimately be your problem, but you owe him this money and this money ought to be paid.

If he pays his creditors and avoids bankruptcy he is just as well off as he is right now. If I don't order you to pay him it may throw him into bankruptcy and he will throw in your claim and discharge that and you will be gone.

All motions are denied. This judgment is absolutely, totally final. There will be no further motions for reconsideration.

You may proceed, Mr. Samuels, to enforce your judgment. If you have to steal the building of the CHA to do so, go do it whatever way you have to do it.

MR. SAMUELS: Thank you, your Honor.

THE COURT: He is owed the money, Jay, pay the money.

Mr. [Jay] WILLIAMS [attorney for the CHA]: Respectfully—

THE COURT: Pay the money and God help you."

The CHA has appealed both the order of May 9, 1990, denying its section 2—1203 motion for a stay of the enforcement of the order of March 12, 1990, granting partial summary judgment and the order of May 31, 1990, denying its motion for reconsideration of the May 9 order.

Supreme Court Rule 192 states:

"When the entry of a summary judgment will not dispose of all the issues in the case, *the court may, as the justice of the case shall require,* either (1) allow the motion and postpone the entry of judgment thereon; (2) *allow the motion and enter judgment thereon;* or (3) allow the motion, enter judgment thereon, and stay the enforcement pending the determination of the re-

maining issues in the case. If a party resisting the entry of a summary judgment relies upon an affirmative demand against the moving party for an amount less than the latter's demand, judgment for the difference may be entered and enforced." (Emphasis added.) (107 Ill. 2d R. 192.)

The Historical and Practice Notes of the rule state:

"Under the present rule, if the party moving for summary judgment is entitled to such a judgment, the court must grant the motion but is accorded a *broad discretion, to be exercised as the justice of the case requires*, to stay the entry of judgment or to stay the enforcement of any judgment actually entered until all the remaining issues in the case are determined. These provisions are *designed to permit the court to prevent possible unfair advantage* which, under some circumstances a party entitled to summary judgment might have if he were able to secure and enforce a judgment in his favor while other issues in the same case were being decided." (Emphasis added.) Ill. Ann. Stat., ch. 110A, par. 192, Historical and Practice Notes, at 223 (Smith-Hurd 1985).

The parties have cited, and our research has discovered, no Illinois case directly discussing Rule 192 in the present context. In the principal Illinois case cited by the CHA, *Suriano v. EMI Services Corp.* (1989), 181 Ill. App. 3d 789, 537 N.E.2d 836, the trial court granted summary judgment on a counterclaim. The plaintiff appealed the summary judgment while his own underlying case proceeded. The appellate court affirmed the summary judgment but *sua sponte* instructed the trial court to stay enforcement of the summary judgment until final judgment was entered in the underlying case. The applicability of Supreme Court Rule 192 was never discussed. The CHA has cited many cases from other jurisdictions, none of which, with one exception, we deem factually apposite. (See generally *Proceeding for Summary Judgment as Affected by Presentation of Counterclaim*, 8 A.L.R.3d 1361 (1966 & Supp. 1989).) That excepted case, which was also cited by the plaintiff and which we will discuss further, supports the plaintiff's position. *Sunbeam Corp. v. Morris Distributing Co.* (1976), 55 A.D.2d 722, 389 N.Y.S.2d 173.

A plain reading of Rule 192 and the Historical and Practice Notes reveals, and the CHA agrees, that the decision on whether to grant enforcement of summary judgment in the face of a counterclaim is a matter firmly within the trial judge's discretion and that a trial judge's discretionary power to stay the enforcement of a summary judgment involves an inquiry into the justice of the case. It is clear

from the comments of the trial judge in this case that he considered the positions of the parties and the relative fairness of staying or enforcing the judgment. As one example, the judge stated, "If [Samuels] pays his creditors and avoids bankruptcy, he is just as well off as he is right now. If I don't order you [the CHA] to pay him it may throw him into bankruptcy and he will throw in your claim and discharge that and you will be gone." The judge weighed the positions of the parties and concluded that fairness required that the judgment be enforced.

The CHA contends that the judge abused his discretion and hinges its position on two assertions of alleged facts: (1) the plaintiff failed to establish adequate insurance coverage of the damages sought under the counterclaim; and (2) the plaintiff allegedly admitted that he was bankrupt or was about to become bankrupt.

We agree that the plaintiff failed to establish insurance coverage of the damages sought under the counterclaim. The judge ordered the plaintiff to provide insurance policies for the period from 1984 through 1988. The plaintiff provided some evidence of insurance coverage only through 1986. Contrary to the plaintiff's argument in the trial court, the counterclaim is based on alleged acts of malpractice which occurred in 1987. (When the plaintiff made that argument in the trial court, the CHA made no response.) Consequently, we repeat, the plaintiff did not establish insurance coverage for the period in question. But that is not the end of the matter. The judge's remarks when he ordered the plaintiff to provide copies of the insurance policy do not indicate that he was of the opinion that the plaintiff had to establish insurance coverage for the entire claim before he would deny the stay of enforcement. Nor do we interpret his final remarks to be a change of position. He said that when he ordered the plaintiff to produce proof of insurance, he "was only trying to help [the CHA] out to get the documents which [the judge] thought were readily available." He pointedly added that there was no proof that the plaintiff was financially unstable.

■ Implicit in the CHA's argument is the contention that absence of malpractice insurance in an amount necessary to satisfy the maximum judgment sought under the counterclaim (in this case over $2,500,000) entitles the CHA to a stay as a matter of law. We do not accept the validity of that contention. Moreover, we note that in its memorandum in the trial court, the CHA admitted that it was probable that any insurance the plaintiff might have would not in any event provide coverage for the punitive damages alleged under the fraud count and treble damages under the RICO count. Thus, under the

CHA's own argument, a general malpractice policy held by most attorneys for common law malpractice, in any amount, would not be sufficient. Before leaving this point, another observation is appropriate. We note that at the CHA's hearing on the motion to reconsider, the plaintiff said that the CHA's counterclaim had "not survived the motion to dismiss" and that the parties were "on the amended counterclaim." In its brief in this court, the CHA has attached a second amended counterclaim filed *September 10, 1990, five months after the notice of appeal was filed.* That second amended counterclaim is in two counts, legal malpractice and breach of contract. We infer from the record that the trial judge determined that the fraud and RICO counts were meritless. We think the merits of a counterclaim are a factor a trial judge may consider in the exercise of his discretion when deciding whether to stay enforcement of summary judgment.

With respect to the second part of the defendant's argument, that is, that the plaintiff was bankrupt or about to become bankrupt, we judge that the evidence is insufficient to support that claim, as the judge found. The alleged repeated admissions of bankruptcy, which we have set forth above, constituted mere argument by the plaintiff that, unless the judgment was paid, the firm might be forced into involuntary bankruptcy; moreover, the plaintiff alleged in count V of his complaint that the CHA had a pattern and practice of withholding payment and forcing small vendors into involuntary bankruptcy. As the trial judge noted, the CHA offered no proof that the plaintiff was financially unstable to justify a stay on the enforcement of the judgment.

In *Sunbeam Corp. v. Morris Distributing Co.* (1976), 55 A.D.2d 722, 389 N.Y.S.2d 173, the defendant-wholesaler admitted its failure to pay the plaintiff-manufacturer for certain goods, and the court awarded the plaintiff summary judgment for $458,351.91. The defendant, however, argued on appeal that its counterclaim against the plaintiff alleging breach of distributorship agreements and seeking an amount in excess of the judgment granted required a stay of the entry and enforcement of the judgment. The appellate division held that

> "while [these counterclaims] are not totally unrelated to plaintiffs' actions for goods sold and delivered, they are plainly distinct and separate therefrom and involve alleged damages of completely different characters and arising out of different occurrences [citations]. Moreover, *there is no indication that plaintiffs are financially unstable so as to warrant any stay of the judgment.*" (Emphasis added.) (55 A.D.2d at 723, 389 N.Y.S.2d at 174-75.)

We judge that the facts of *Sunbeam* are applicable here and its holding appropriate. See also *Arimizu v. Financial Security Insurance Co.* (Haw. App. 1984), 679 P.2d 627, 634 (The appellate court affirmed the trial judge's exercise of discretion in granting the plaintiff's motion for summary judgment despite the existence of a counterclaim alleging a setoff, noting that, among other factors, the trial judge considered that "there was nothing in the record to indicate that [the plaintiff] would be judgment proof if and when [the defendant] obtained a judgment on its counterclaim").

In sum, the CHA, as the movant, had the burden of establishing its right to a stay. The trial judge concluded that it had not maintained that burden. The record does not justify the substituting of our judgment for that of the trial judge.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.